Rockingham
No. 2001-019

YVONNE RANDALL, ADMINISTRATRIX OF THE ESTATE OF LAURENCE HILL

v.

CHRISTOPHER BENTON, M.D.

Argued: May 1, 2002
Opinion Issued: June 24, 2002

*Boynton, Waldron, Doleac, Woodman & Scott, P.A.*, of Portsmouth (*Francis X. Quinn* on the brief and orally), for the plaintiff.

*Walsh & Associates*, of Manchester (*Robert M. Walsh* on the brief and orally), for the defendant.

*Elizabeth Cazden*, of Manchester, by brief for the New Hampshire Psychiatric Society, as *amicus curiae*.

*Gottesman & Hollis, P.A.*, of Nashua (*Anna Barbara Hantz* on the brief), for the New Hampshire Trial Lawyers Association, as *amicus curiae*.

DUGGAN, J. The plaintiff, Yvonne Randall, administratrix of the estate of Laurence Hill, appeals following a jury trial verdict in favor of the defendant, Christopher Benton, M.D. On appeal, the plaintiff argues that the Trial Court (*McHugh*, J.) erred in instructing the jury. The defendant cross-appeals, arguing that the trial court erred in denying his motions for a directed verdict. We agree with the defendant, and accordingly affirm the judgment in his favor.

The parties adduced the following facts at trial. On July 11, 1996, Laurence Hill arrived at Hampstead Hospital (hospital) to be admitted voluntarily because he was having problems coping with the breakup of a long-term relationship with his girlfriend, Lee Ann Frost. Frost is also the mother of Hill's son, who at the time was three years old. At the hospital, Hill was evaluated and treated by Dr. Benton, a staff psychiatrist.

At the time of admission, Hill admitted that he had thoughts of suicide. He reported that three to four weeks prior to admission, following an argument with Frost, he had pointed a gun to his head. He disclosed a history of alcohol use that included a conviction for driving while intoxicated, blackout experiences and, recently, consumption of six to eight beers each night. He also reported experiencing symptoms consistent with depression.

Dr. Benton diagnosed Hill as suffering from depression, alcohol abuse and psycho-social stressors of family discord. Dr. Benton's treatment plan included having Hill take medication prescribed for depression, meet with Frost, attend individual and group psychotherapy and group chemical dependency education sessions, and participate in a twelve-step program, such as Alcoholics Anonymous. While at the hospital, Hill took the medication as prescribed. He refused, however, to meet with Frost at any time during his stay at the hospital, but did visit with his mother on several occasions. He also initially declined to participate in a group for psychotherapy and chemical dependency education, but later participated.

On July 15, 1996 – four days after his arrival -- Hill informed the hospital that he wanted to be discharged within twenty-four hours. That same day, Dr. Benton evaluated Hill. Hill told Dr. Benton that his stay in the hospital had helped him "clear [his] head up," and that he did not have any thoughts of suicide. Dr. Benton concluded that Hill did not meet the criteria for involuntary admission. *See* RSA 135-C:27 (Supp. 2001). Upon discharge, Dr. Benton instructed Hill to take the medication prescribed for depression and to undertake follow-up treatment with an outpatient mental health provider.

During the next twelve days, Hill lived in the community, spending time with his parents, his child and Frost. He attempted to return to work, but his employer told him "to take time off." He spent time fishing and visited

the American Legion. On July 28, 1996, after spending the afternoon fishing, Hill appeared at Frost's home, ate dinner and watched television. That evening, Hill took offense at a comment Frost made and accused her of "calling him crazy." Frost called Hill's mother to ask that she come over. By the time his mother arrived, Hill was walking to the door. Hill's mother followed him to the driveway where his truck was located. While in the driveway with his mother, Hill superficially slashed both wrists with a knife. He drove to his mother's home where he searched her bedroom for a gun. When his mother arrived shortly thereafter, she told him, "I know what you're looking for, and you're not going to find it." He then drove to his father's home where he found a gun and shot himself. Blood tests revealed that at the time of the shooting Hill's blood alcohol content was .157.

We first address whether the trial court should have granted Dr. Benton's motions for directed verdict. A motion for directed verdict "should be granted only when the sole reasonable inference that may be drawn from the evidence, which must be viewed in the light most favorable to the nonmoving party, is so overwhelmingly in favor of the moving party that no contrary verdict could stand." *Bronson v. The Hitchcock Clinic,* 140 N.H. 798, 800 (1996) (quotation omitted).

Dr. Benton filed motions for directed verdict at the close of the plaintiff's case and at the close of all the evidence. In his motions and on appeal, Dr. Benton argues that even assuming that he failed to provide medical care completely consistent with the standard of care, it would not be reasonably foreseeable that such failure would cause Hill to commit suicide after his discharge from the hospital.

In a medical negligence action, the plaintiff has the burden of proving: (1) "The standard of reasonable professional practice in the medical care provider's profession or specialty"; (2) "That the medical care provider failed to act in accordance with such standard"; and (3) "That as a proximate result thereof, the injured person suffered injuries which would not otherwise have occurred." RSA 507-E:2, I (1997); *Francoeur v. Piper,* 146 N.H. 525, 527 (2001). This statutory standard reflects the plaintiff's burden at common law to produce sufficient evidence that Dr. Benton's negligence proximately caused the patient's injury. *Bronson,* 140 N.H. at 801. "Negligent conduct is a proximate or legal cause of harm, if the actor's conduct is a substantial factor in bringing about the harm." *Pillsbury-Flood v. Portsmouth Hospital,* 128 N.H. 299, 304 (1986) (quotations and brackets omitted).

At trial, the plaintiff's expert testified that Hill exhibited a number of risk factors for suicide that persisted at the time he was discharged from the hospital: Hill was depressed, had a history of alcohol abuse, was

dealing with disruption in an important relationship, had experienced sleep disturbance, had reported hopelessness and helplessness at the time of admission, and had held a loaded gun to his head three to four weeks before admission. The plaintiff's expert testified that a suicide assessment for acute risk of suicide would be reliable for at most seventy-two hours. If Hill were assessed for acute risk of suicide, he may have been eligible for involuntary emergency admission. *See* RSA 135-C:27 (person is eligible for involuntary emergency admission if "as a result of a mental illness [he] pose[s] a likelihood of danger to himself" as demonstrated by "threaten[ing] to inflict serious bodily injury on himself [within the past forty days] and there is a likelihood that an act or attempt of serious self-injury will occur if admission is not ordered"). The plaintiff's expert, however, did not testify that the standard of reasonable care required involuntary emergency admission as the appropriate step for treating Hill.

Nonetheless, the plaintiff contends that given the risk factors for suicide that Hill exhibited, Dr. Benton failed to provide Hill with a sufficiently detailed and comprehensive aftercare plan. The plaintiff's expert first testified that Dr. Benton should have assessed Hill's ability to access guns and then "follow[ed] up on it." According to the plaintiff's expert, the standard of care required Dr. Benton to review with Hill potential signs of trouble, such as feeling suicidal, using alcohol, feeling depressed if he was unable to work, and then to review ways to cope, including identifying specific interventions such as obtaining nonprofessional and professional support. The plaintiff's expert also testified that when a patient, such as Hill, has an alcohol abuse problem, the standard of care required Dr. Benton to recommend participation in a program such as Alcoholics Anonymous. Further, when prescribing medication, the standard of care required Dr. Benton to monitor Hill's response to the medication until his care was transferred to another doctor. The standard of care also required Dr. Benton to review thoroughly with Hill how to take the medication, that alcohol should not be used with the medication, the side effects and the appropriate response should the side effects materialize, and the name and number of a person Hill could contact for assistance if he had questions about the medication.

When asked whether Dr. Benton complied with the standard of care, the plaintiff's expert testified that he failed to provide adequate documentation to confirm that he had. The plaintiff's expert noted on several occasions that Dr. Benton's documentation failed to conform to the standard of care for accuracy. The expert, however, did not testify that Dr. Benton, in fact, had not provided Hill treatment that conformed to the standard of care. Dr. Benton testified that he told Hill that "he should

avoid alcohol" and "[i]f he had any problems with that issue of avoiding alcohol, [Dr. Benton] recommend[ed] 12-step groups[,]. . . [but Hill] still wasn't terribly interested in going to AA or other 12-Step meetings." The plaintiff's expert agreed that Dr. Benton's records confirm that he and Hill had discussed a twelve-step program. Dr. Benton also testified that he informed Hill that he should contact, either the aftercare facility, his primary care physician, the hospital or the emergency room of any hospital if he felt he needed professional support at any time. He also gave Hill specific instructions that if he called the hospital, he should ask for Dr. Benton and if he was not available, he should ask for the physician on call. For aftercare, Dr. Benton recommended a mental health center where Hill would have a variety of resources available to help him to develop coping strategies and to monitor his medication. The social worker at the hospital. set up an intake appointment for Hill. Finally, Dr. Benton testified that, when initially prescribing the medication, he and Hill discussed "at great length" the use and side effects of the medication, and upon discharge, he reviewed the correct dosage and the fact that it should not be taken with alcohol. Even if we assume that a reasonable inference can be drawn from this evidence that Dr. Benton's treatment did not conform to the standard of care, however, the plaintiff still needed to show that this failure was a proximate cause of Hill's suicide.

On the issue of proximate cause, the plaintiff's expert testified that "[g]iven all [the] risk factors, it's my opinion that Mr. Hill's committing suicide was a foreseeable event." That the suicide was a foreseeable event, however, does not mean that Dr. Benton's failure caused the suicide. When asked whether "within a reasonable degree of medical certainty [Dr. Benton's] deviations caused or substantially contributed to Mr. Hill's suicide," the plaintiff's expert simply answered, "Yes. That these cumulative deviations from the standard of care substantially contributed to Mr. Hill's death by suicide." Beyond this bald conclusion, however, the plaintiff's expert did not provide any specific testimony showing a causal link between Dr. Benton's conduct and Hill's suicide.

■ The plaintiff offered no specific testimony that if Dr. Benton had taken these additional steps Hill would not have otherwise committed suicide. *Cf. Hodgdon v. Frisbie Mem. Hosp.*, 147 N.H. 286, 290-91 (2001) (testimony that plaintiff suffered injury that she otherwise would not have suffered had physician properly diagnosed and immediately treated her condition was sufficient to show causation). First, Hill's father, in his testimony, did not state that had Dr. Benton informed him of the risk involved with keeping guns at his home that he would have removed the

guns. Next, the plaintiff's expert did not provide any testimony linking Hill's suicide to the possibility that he could have had a harmful response to the medication. Additionally, the plaintiff's expert did not provide any testimony that had Dr. Benton properly documented his discussions with Hill, Hill would not have committed suicide. The plaintiff's expert also did not provide any testimony that had Dr. Benton monitored Hill until the appointment with the aftercare provider, Hill would not have committed suicide. Finally, the plaintiff's expert did not provide any testimony that had Dr. Benton reviewed with Hill more potential stressors and ways to cope, then Hill would have coped better with his failed attempt to return to work and his attempt to reconcile with Frost, would have refrained from using alcohol and would not have committed suicide. Because the plaintiff failed to provide any evidence that Hill's suicide would not have otherwise occurred, the sole reasonable inference that may be drawn from the evidence, viewed in the light most favorable to the plaintiff, is so overwhelmingly in favor of the conclusion that any failure of Dr. Benton was not a proximate cause of Hill's suicide that no contrary verdict could stand. Accordingly, we agree the trial court should have granted Dr. Benton's motion for directed verdict and we affirm the judgment for Dr. Benton.

In light of our decision, we need not address whether the trial court erred in instructing the jury.

*Affirmed.*

BROCK, C.J., and NADEAU and DALIANIS, JJ., concurred.