889 A.2d 245 (2005)
2005 VT 121
Sheryl R. WILKINS
v.
LAMOILLE COUNTY MENTAL HEALTH SERVICES, INC. and Copley Hospital.
No. 03-552.
Supreme Court of Vermont.
October 21, 2005.
*246 James A. Dumont of Law Office of James A. Dumont, P.C., Bristol, for Plaintiff-Appellant.
John D. Monahan, Jr. and Angela R. Clark of Dinse, Knapp & McAndrew, P.C., Burlington, for Defendant-Appellee.
Present: DOOLEY, JOHNSON, SKOGLUND and REIBER, JJ., and GIBSON, J. (Ret.), Specially Assigned.
¶ 1. JOHNSON, J.
This appeal arises out of the suicide of twenty-two-year-old Melissa Issler, whose estate filed this action against Lamoille County Mental Health Services, Inc. (hereafter "defendant") alleging that defendant's negligence in treating Ms. Issler's suicidal condition was the cause of her death. The estate (hereafter "plaintiff") appeals from a summary judgment in favor of defendant. Although we do so on slightly different grounds, we affirm the judgment of the trial court. Based on controlling law and the undisputed material *247 facts, we hold that plaintiff failed to adduce evidence sufficient to prove that defendant's conduct was the proximate cause of death.
¶ 2. The material facts are undisputed. On January 19, 1999, Ms. Issler (hereafter "decedent") was brought to Copley Hospital in Morrisville after taking an overdose of Xanax tablets. There, as alleged in the complaint, she "received treatment and was evaluated by emergency room staff and an Emergency Service Worker" employed by defendant, which had contracted with the hospital to provide mental health evaluations. After her physical condition was stabilized, decedent was interviewed by the emergency services worker, Kathleen Greenmun, for a period of between fifteen and twenty-five minutes. In her notes from the interview, Greenmun reported that decedent appeared "groggy" and "pale," that she had recently experienced a series of seizures, and that after a particularly severe seizure "she felt something snapped, and she attempted to swallow a bottle of medication not her own." According to Greenmun's notes, decedent stated that "things had piled up" and that "she felt overwhelmed." Decedent acknowledged, however, that "taking the overdose was a stupid, impulsive act." She "denie[d] any current suicidal ideation or plan," and indicated that she wanted to go home to rest at her boyfriend's residence.
¶ 3. Based on the interview, Greenmun concluded that decedent was not a suicide risk, and could safely go home. The interview notes indicate that Greenmun encouraged decedent to call Lamoille County Mental Health to discuss counseling, and to contact the mental health agency if she again felt overwhelmed. Decedent's boyfriend and another friend met her at the hospital. Greenmun recalled that she talked with them about removing medications from the house, but said nothing about firearms. Decedent's boyfriend stated that he removed and destroyed a number of medications from the home, but that it did not occur to him to remove a loaded pistol that he kept in his truck. Six days after the initial incident, on the morning of January 25, 1999, decedent entered the truck, removed the pistol from its holster, and shot herself in the head. She died shortly thereafter.
¶ 4. In January 2001, plaintiff filed this action against defendant, alleging that decedent's suicide was a proximate result of Greenmun's "negligence in treating [decedent's] suicidal condition."[1] Plaintiff alleged specifically that Greenmun had been negligent in failing to determine whether any guns were available to decedent at her boyfriend's home, neglecting to enter into a "safety contract" with decedent, failing to initiate and schedule a follow-up appointment for decedent, and failing to contact decedent's treating physician regarding the reported seizures. In support of the claim, plaintiff's expert witness, Dr. David Ellenbrook, Ph.D., offered his opinion that Greenmun had deviated from professional standards of care in evaluating and treating patients at risk of suicide in several respects, including her decision to conduct the evaluation while decedent was still groggy rather than to wait until she was more alert, and her omissions in failing to conduct an adequate suicide assessment, to enter into a written safety contract with decedent, and to schedule follow-up appointments with decedent before her discharge. It was Dr. Ellenbrook's opinion that these additional *248 steps would have resulted in "a decreased probability" of decedent's committing suicide.
¶ 5. Defendant moved for summary judgment on the ground that plaintiff had failed to adduce expert testimony establishing the requisite causal link between the alleged negligence and decedent's suicide. Plaintiff opposed the motion and filed a cross-motion for partial summary judgment, alleging that defendant had violated certain safety regulations, requiring a finding of negligence per se. The trial court issued a written decision in October 2003, ruling that the expert's testimony was deficient on several grounds, and that defendant was therefore entitled to summary judgment. This appeal followed.
¶ 6. Plaintiff principally contends the court erroneously rejected the testimony of her expert witness, Dr. Ellenbrook. The court found that Dr. Ellenbrook's testimony failed to establish the requisite causal link between defendant's conduct and decedent's suicide because, in the court's view, "it is an opinion without basis, without substance." The court asserted that the testimony offered "no explanation as to the mechanistic steps of causation[,] ... no analytic brick building." Accordingly, it concluded that the opinion failed to establish the necessary causal element of 12 V.S.A. § 1908(3), which requires the plaintiff to prove "[t]hat as a proximate result" of the defendant's failure to exercise the requisite degree of care "the plaintiff suffered injuries that would not otherwise have been incurred" in order to establish medical negligence.[2]
¶ 7. We are uncertain as to the precise meaning of the court's ruling or the basis of the "substantive" or "mechanistic" deficiencies to which it refers. Nevertheless, it is axiomatic that a judgment predicated on one theory that proves to be unfounded will be affirmed if it may be correctly resolved on another. See Gochey v. Bombardier, Inc., 153 Vt. 607, 613, 572 A.2d 921, 925 (1990) (this Court "may affirm a correct judgment even though the grounds stated in support of it are erroneous"). In this case, it is undisputed that plaintiff failed to adduce an expert opinion that decedent's suicide would not have occurred in the absence of defendant's alleged negligence. Accordingly, as explained more fully below, we agree with the trial court's fundamental conclusion that plaintiff failed to establish the essential causal element of her claim, and that defendant was therefore entitled to summary judgment.
¶ 8. The principal basis of defendant's motion for summary judgment, and the focal point of dispute between the parties, was the legal sufficiency of an expert opinion that failed to assert decedent's suicide would not have occurred in the absence of defendant's alleged negligence. Plaintiff's expert-witness disclosure statement had described her expert, Dr. Ellenbrook, as holding the opinion that defendant's negligence "was a substantial and significant factor in the patient's death." Defendant's attorney attempted to explore this statement at Dr. Ellenbrook's deposition, asking whether it "mean[s] that except for those failures to meet the standard of care that you have testified to, Melissa Issler would not have killed herself?" Dr. Ellenbrook responded, "I would say that there is a decreased probability that she would have." Defendant's attorney had the *249 question re-read on the ground that the answer was nonresponsive, but Dr. Ellenbrook maintained the same response, stating: "Other than the answer I gave you, I can't answer that question, other than to give you that answer." When pressed again, Dr. Ellenbrook's response remained essentially the same, to the effect that the risk of decedent's suicide would have been "[s]ignificantly decreased if the standards of care had been met, or at least decreased." Beyond that he would not, or could not, go.
¶ 9. As noted, defendant argued below that Dr. Ellenbrook's testimony failed to establish a necessary statutory element of plaintiff's claim, to wit, that "as a proximate result" of defendant's failure to meet the standard of care "the plaintiff suffered injuries that would not otherwise have been incurred." 12 V.S.A. § 1908(3). Plaintiff argued, in response, that to establish proximate cause it was sufficient merely to showas Dr. Ellenbrook had essentially statedthat defendant's negligence was a "substantial factor" in placing decedent at a "greater risk" of harm. The trial court appeared to accept plaintiff's formulation, but rejected the testimony as inadequate on other grounds.
¶ 10. We have recently reaffirmed the common-law and statutory principle that in medical malpractice, as in tort law generally, "the plaintiff must prove that as a result of the defendant's conduct the injuries `would not otherwise have been incurred,'" and therefore "an act or omission of the defendant cannot be considered a cause of the plaintiff's injury if the injury would probably have occurred without it." Smith v. Parrott, 2003 VT 64, ¶ 12, 175 Vt. 375, 833 A.2d 843 (quoting 12 V.S.A. § 1908(3)). The plaintiff in Smith had urged adoption of the so-called "loss of chance" doctrine to permit recovery where the defendant's malpractice had increased the risk of harm, even where the plaintiff could not adduce evidence of a probability that, as a result of the malpractice, the plaintiff suffered injuries that would not otherwise have occurred. Id. ¶ 7. In addressing the issue, we recognized the several "policy arguments in favor of the doctrine, most notably the harshness of the traditional rule in denying recovery" where the defendant's negligence may have significantly increased the risk of harm. Id. ¶ 8. Nevertheless, we declined to adopt the loss-of-chance doctrine, noting that it represented a "significant departure from the traditional meaning of causation in tort law," id. ¶ 13, and posed ramifications for the practice of medicine, as well as perhaps other professions in Vermont, better addressed through legislative action "where hearings may be held, data collected, and competing interests heard before" a correct decision is reached. Id. ¶ 14.
¶ 11. The same considerations impel a like conclusion here. We recognize, as in Smith, the difficulties of proof that may inhere in meeting the traditional causation standard in malpractice cases, and the potentially harsh outcomes that may result. Such difficulties may, indeed, be uniquely complex and challenging in cases involving suicide, where even under accepted standards of care predictions of suicide are notoriously difficult and compounded by the fact that the patient, unlike other malpractice situations, may be actively working at cross-purposes to the practitioner's goals. See, e.g., Peoples Bank of Bloomington v. Damera, 220 Ill.App.3d 1031, 163 Ill.Dec. 475, 581 N.E.2d 426, 429 (1991) (noting that unlike typical malpractice case, the suicidal patient may not "share the goal of his physician of getting better"); Randall v. Benton, 147 N.H. 786, 802 A.2d 1211, 1215 (2002) (affirming judgment for defendant psychologist where plaintiff's expert testified that defendant's *250 deviations from standard of care "substantially contributed to [decedent's] death by suicide" but "failed to provide any evidence that [decedent's] suicide would not have otherwise occurred"); Nieves v. City of N.Y., 91 A.D.2d 938, 458 N.Y.S.2d 548, 549 (1Dept.1983) (concluding that although plaintiff's expert was able to testify that decedent's suicide "could have been" a result of his premature discharge from emergency room and that it was "possible" decedent would not have committed suicide otherwise, such evidence was insufficient to meet traditional causation standard); see generally P. Coleman & R. Shellow, Suicide: Unpredictable and Unavoidable-Proposed Guidelines Provide Rational Test for Physician's Liability, 71 Neb. L.Rev. 643, 644-45 (1992) (discussing factors that make suicide difficult for mental health practitioners to predict).
¶ 12. Such complexity does not, however, militate in favor of lowering the causation threshold, but rather reinforces Smith's conclusion that such a departure implicates an array of medical-practice, economic, and social issues better addressed through the legislative process. Nor, in fact, does the traditional causation standard represent an insurmountable barrier to recovery in malpractice claims involving suicide. While plaintiffs' verdicts in such casesas in medical malpractice cases generallymay be difficult to achieve, they are not uncommon. See, e.g., Bramlette v. Charter-Medical-Columbia, 302 S.C. 68, 393 S.E.2d 914, 916 (1990) (rejecting hospital's claim that plaintiff had failed to establish "but for" causation where patient on recreational outing jumped from bridge); Husted v. Echols, 919 S.W.2d 43, 45 (Tenn.Ct.App.1995) (holding that it was error to direct verdict for defendant where expert testified that defendant's "failure to adequately evaluate and treat [decedent] was a direct proximal cause of his death by suicide"); Providence Health Ctr. v. Dowell, 167 S.W.3d 48, 53-56 (Tex.App.2005) (upholding judgment for parents of suicidal patient released from emergency room of hospital who subsequently hanged himself and rejecting claim that plaintiffs had failed to prove but-for causation); see generally P. Kussman, Annotation, Liability of Doctor, Psychiatrist, or Psychologist for Failure to Take Steps to Prevent Patient's Suicide, 81 A.L.R.5th 167, 199-201, 203-04, 216-19 (2000) (collecting cases).
¶ 13. Nor is it the case, as plaintiff argues, that we have applied a lower causation standard under the guise of the so-called "substantial factor" test. Indeed, plaintiff's premisethat a "substantial factor" means something less than but-for cause and therefore may support liability in this caseis fundamentally mistaken. Although the Restatement (Second) of Torts § 431(a) (1965) employs the phrase "substantial factor" in its definition of proximate cause, it is widely recognized  as explained in the comments to the most recent Draft of the Restatement of Torts  that "[w]ith the sole exception of multiple sufficient causes, `substantial factor' provides nothing of use in determining whether factual cause exists." Restatement (Third) of Torts, Proposed Final Draft No. 1 § 26 cmt. j, at 443 (2005).[3] As *251 the comments to the Draft Restatement (Third) of Torts explain:
The essential requirement, recognized in both Torts Restatements, is that the party's tortious conduct be a necessary condition for the occurrence of the plaintiff's harm: The harm would not have occurred but for the conduct. To the extent that substantial factor is employed instead of the but-for test, it is undesirably vague. As such it may lure the factfinder into thinking that a substantial factor means something less than but-for cause .... Thus, use of substantial factor may unfairly permit proof of causation on less than a showing that the tortious conduct was a but-for cause ....
... [I]ts overuse, abuse, and the confusion generated by it in determining factual causation counsel against its continued employment.
Id. at 443-44; accord D. Robertson, The Common Sense of Cause in Fact, 75 Tex. L.Rev. 1765, 1776, 1780 (1997) ("In the narrowest and only fully legitimate usage, the term [substantial factor] describes a cause-in-fact test that is useful as a substitute for the but-for test in a limited category of cases in which two causes concur to bring about an event, and either cause, operating alone, would have brought about the event absent the other cause .... When courts begin turning to the substantial factor vocabulary in a broader range of cases, valuable precision of analysis is lost and nothing is gained.") (quotations omitted).
¶ 14. A claim similar to plaintiff's was recently considered by the Oregon Court of Appeals in Joshi v. Providence Health System of Oregon Corp., 198 Or.App. 535, 108 P.3d 1195 (2005), where the plaintiff argued that the Oregon courts had abandoned but-for causation in malpractice cases "in favor of a more lenient `substantial factor'" test. Id. at 1198. The court categorically rejected the claim, explaining: "When employed as a standard for determining cause-in-fact, the phrase `substantial factor' generally does not eliminate the concept of `but-for' causation. Rather, the substantial factor standard is an alternate description of the cause-in-fact test and requires a showing of `but-for' causation in all but a few cases." Id.; see also Viner v. Sweet, 30 Cal.4th 1232, 135 Cal. Rptr.2d 629, 70 P.3d 1046, 1051 (2003) (noting that the substantial-factor test "subsumes the `but for' test" and holding that there is nothing distinctive about legal malpractice cases "that would justify a relaxation of, or departure from, the well-established requirement in negligence cases that the plaintiff establish [but-for] causation"). Like these and other courts, we have occasionally employed the phrase "substantial factor" in referring to proximate cause, see, e.g., Lorrain v. Ryan, 160 Vt. 202, 206-08, 628 A.2d 543, 546-48 (1993); Chater v. Cent. Vt. Hosp., 155 Vt. 230, 234-35, 583 A.2d 889, 891 (1990), but we have never abandoned the but-for test of causation or suggested that "substantial factor" represents anything other than an equivalent formulation of the but-for test. Accordingly, we find no merit to plaintiff's claim.
¶ 15. Finally, plaintiff contends the trial court erred in ruling that the medical malpractice statute, 12 V.S.A. § 1908, applies here, and that expert testimony was required to establish the proximate-cause element set forth in § 1908(3). As to the first part of the claim, plaintiff asserts that the mental health worker who evaluated decedent does not fit within the category *252 of hospital "personnel" covered by § 1908 because the evaluator was an employee of Lamoille County Mental Health under contract with Copley Hospital rather than a hospital employee.[4] Plaintiff's claim is contained in a footnote in her opening brief, and is not sufficiently briefed or argued to warrant consideration on appeal. See Johnson v. Johnson, 158 Vt. 160, 164 n. *, 605 A.2d 857, 859 n. * (1992) (Court will not consider claims so inadequately briefed as to fail to meet standards of V.R.A.P. 28(a)(4)).
¶ 16. Nevertheless, even assuming, without deciding, that § 1908 does not apply, it is of no consequence. The malpractice statute, as we have previously noted, merely codifies longstanding common-law principles relating to causation in negligence law, and therefore adds nothing substantive to the causal requirements of plaintiff's case. See Smith, 2003 VT 64, ¶ 11, 175 Vt. 375, 833 A.2d 843 (noting that the malpractice statute "essentially codifies the common law elements of a medical malpractice action") (citation omitted). Plaintiff's case rests squarely on the allegation expressed in her complaint that defendant's negligence "in treating [decedent's] suicidal condition" proximately caused her death. We have repeatedly held that the standard-of-care and causation elements of professional negligence claims "[o]rdinarily ... must be proved by expert testimony," Jones v. Block, 171 Vt. 569, 569, 762 A.2d 846, 848 (2000) (mem.), and this is no less true of claims relating to the negligent treatment or assessment of patients at risk of committing suicide. See, e.g., Dimitrijevic v. Chi. Wesley Mem'l Hosp., 92 Ill.App.2d 251, 236 N.E.2d 309, 313 (1968) (whether defendants were negligent "in not characterizing decedent as a suicidal risk falls within the general rule requiring the affirmative testimony of experts"); Kanter v. Metro. Med. Ctr., 384 N.W.2d 914, 916 (Minn.Ct. App.1986) (because "potential tendencies of patients suffering from mental illness" are not easily determined "without special training and knowledge," court did not abuse discretion in requiring expert testimony to establish nurse's alleged negligent care of patient who committed suicide); Moats v. Preston County Comm'n, 206 W.Va. 8, 521 S.E.2d 180, 188 (1999) (determining whether mental health center's negligence caused suicide "involves complicated medical issues, specifically, the manner and method of protecting someone who is suicidal," that are not within knowledge of lay jurors); see also Estate of Joshua T. v. State, 150 N.H. 405, 840 A.2d 768, 772 (2003) (holding that because "[s]uicide is not easily explained or understood" and "[i]ts causes, prevention, triggers and warning signs cannot be readily calculated," expert testimony is required to establish causal link between suicide and alleged negligence in placing decedent in foster home).
¶ 17. Plaintiff's claim that defendant deviated from the standard of care by prematurely evaluating decedent while she was still feeling the effects of the overdose; failing to conduct a sufficient suicide-risk evaluation, including the risk posed by firearms; failing to require a written safety contract; and failing to schedule follow-up appointments, together with the claim that such conduct was the proximate cause of decedent's suicide, all involve complex psychiatric/medical issues relating to the causes, warning signs, and prevention of suicide. These are plainly not issues within a lay juror's common knowledge and *253 experience. See Estate of Fleming v. Nicholson, 168 Vt. 495, 497-98, 724 A.2d 1026, 1028 (1998) (expert testimony not required "[w]here a professional's lack of care is so apparent that only common knowledge and experience are needed to comprehend it"). Accordingly, we find no error in the court's ruling that expert testimony was required under traditional common-law principles, and thus no basis to disturb the judgment.
Affirmed.
NOTES
[1] The complaint also named Copley Hospital, Inc. as a defendant, alleging violations of the federal Emergency Medical Treatment and Active Labor Act, 42 U.S.C. § 1395dd (2005), but plaintiff settled with the hospital and dismissed the claim.
[2] Plaintiff also contends in this regard that the trial court erroneously "excluded" Dr. Ellenbrook's testimony, but the court merely stated that the testimony was so deficient in "substance" and "basis" that "it would not be admissible under Vermont Rule of Evidence 702." The court did not, however, actually rule the opinion inadmissible.
[3] The classic illustration of "multiple sufficient" or "independent concurring" causes involves a situation where two separate fires (only one of which was caused by the defendant) join together to damage property, and either of which was sufficient to cause the harm, but it is impossible to determine which actually did so. Since the harm would have occurred without the defendant's conduct, the plaintiff cannot satisfy the "but for" test. In such a case, "the substantial-factor test can be useful because it substitutes for the but-for test in a situation in which the but-for test fails to accomplish what the law demands." Restatement (Third) of Torts, Proposed Final Draft No. 1 § 26 cmt. j, at 444. This concept is codified in the Restatement (Second) of Torts § 432(2).
[4] Section 1908 applies to actions based on the negligence "of the personnel of a hospital, a physician ..., a dentist ..., a podiatrist ..., a chiropractor ..., a nurse ..., or an osteopathic physician...."