NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2021 VT 73

No. 2020-260

| | |
|---|---|
| Renee Bittner, as Administrator of the Estate of Joshua Bittner | Supreme Court |
| v. | On Appeal from Superior Court, Franklin Unit, Civil Division |
| Centurion of Vermont, LLC et al. | March Term, 2021 |

Robert A. Mello, J.

David C. Sleigh of Sleigh Law, St. Johnsbury, for Plaintiff-Appellee.

Pamela L.P. Eaton and Stephen J. Soule of Paul Frank + Collins P.C., Burlington, for
  Defendants-Appellants.


PRESENT: Reiber, C.J., Robinson, Eaton, Carroll and Cohen, JJ.


¶ 1. **EATON, J.** In this interlocutory appeal, defendants challenge the trial court's denial of their motion to dismiss plaintiff's medical malpractice claim. They maintain that dismissal was required because plaintiff did not file a certificate of merit (COM) with her complaint as required by 12 V.S.A. § 1042(a) and the trial court did not find, nor does the complaint show, that this is a "rare instance" where expert testimony is unnecessary under § 1042(e). We agree with defendants and therefore reverse the trial court's decision.

¶ 2.     Joshua Bittner committed suicide in March 2017 while in the custody of the Vermont Department of Corrections (DOC).  Plaintiff is the administrator of Mr. Bittner's estate. In February 2019, plaintiff filed a complaint against DOC, Centurion of Vermont, LLC, and several individual health-care providers employed by Centurion and DOC to provide mental health services at Northwest State Correctional Facility and Northern State Correctional Facility.  The complaint included the medical malpractice claim at issue here.

¶ 3.     Plaintiff's initial complaint alleges the following.[1]   On February 3, 2017, Mr. Bittner was arrested on various charges and held for lack of bail.  Based on prior mental health screenings, DOC knew of Mr. Bittner's mental health problems and associated risk factors.  Before Mr. Bittner was detained at Northwest State, a crisis worker from Northwestern Counseling and Support Services conducted an emergency psychiatric evaluation of Mr. Bittner. During the evaluation, Mr. Bittner reported that he suffered from depression and felt suicidal.  The evaluator advised the transport officers that Mr. Bittner should be placed under "watch" until he became more stable and recommended that Mr. Bittner be given mental health care as soon as possible. One of the transport officers notified the intake officer at Northwest State that Mr. Bittner had been determined to be suicidal in the recent evaluation.  Shortly thereafter, during a requisite medical intake at Northwest State, Mr. Bittner was noted to be crying extensively and making suicidal comments.  As a result, Mr. Bittner was placed in a smock and continued on fifteen-minute watch.

¶ 4.     The following day, defendant Sutton, a mental health care provider at Northwest State, conducted a self-harm assessment and ordered Mr. Bittner placed in mental health segregation on camera with mental health checks every fifteen minutes.  Defendant Sutton noted

---

[1]   For reasons discussed below, we rely only on the allegations in plaintiff's initial complaint in evaluating whether dismissal is appropriate for failure to satisfy the requirements of 12 V.S.A. § 1042.

that Mr. Bittner reported positive suicidal ideation and previous self-harm and presented as depressed and anxious; defendant Sutton made an identical note regarding Mr. Bittner's mental state the following day.

¶ 5.    On February 8, defendant Sutton and defendant Supley, another mental health care provider, evaluated Mr. Bittner and ordered that he remain in segregated housing. On February 14, defendant Sutton again evaluated Mr. Bittner and ordered him returned to segregated housing after he indicated anew possible self-harm. On February 16, Mr. Bittner was prescribed antidepressants to begin February 19. The prescriber cited Mr. Bittner's prior self-harm, history of treatment at the Howard Center, and persistent symptoms; he ordered a follow-up on April 6 but a mental health visit if "medicine effects worsened."

¶ 6.    On February 17, Mr. Bittner was transferred to Northern State. An intra-system transfer note documented that he was in active detoxification, on a new medication, and had a mental health diagnosis, but it did not include "a mental health alert."[2]

¶ 7.    On February 20, defendant Rebbe, a mental health care provider, evaluated Mr. Bittner at Northern State. Mr. Bitter stated that he was depressed, had just started a new anti-depressant, and was having trouble sleeping; the complaint did not allege that he reported suicidal thoughts. Defendant Rebbe prescribed meetings every ninety days. Mr. Bittner was not otherwise evaluated or monitored for worsening symptoms related to his new medications and he was not housed in mental health segregation. Ten days later, on March 2, Mr. Bittner was found hanging in his cell; he was pronounced dead the following day.

---

[2]    The nature and significance of a "mental health alert" is not explained in plaintiff's complaint.

3

¶ 8.     Based on these assertions, plaintiff alleged that defendants "failed in their duty to provide medical and mental health care which met the standard of care to which [Mr. Bittner] was entitled" and that this violation of the standard of care caused his death.

¶ 9.     By statute, a plaintiff cannot file a civil action to recover damages for wrongful death if the death allegedly "resulted from the negligence of a health care provider, unless the attorney or party filing the action files a certificate of merit simultaneously with the filing of the complaint." 12 V.S.A. § 1042(a).  In the COM, the plaintiff or his or her attorney must certify that they consulted with a health care provider, the provider described the applicable standard of care, and the provider found it reasonably likely that the plaintiff could show that the standard of care was violated and that the violation led to the plaintiff's injury.  Id.  Failure to file a COM is "grounds for dismissal of the action without prejudice, except in the rare instances in which a court determines that expert testimony is not required to establish a case for medical malpractice."  Id. § 1042(e).

¶ 10.     Plaintiff did not file a COM with her initial complaint in February 2019 although she separately requested to extend the statute of limitations to provide a COM until June 1, 2019. See id. § 1042(d) ("Upon petition . . . , an automatic 90-day extension of the statute of limitations shall be granted to allow the reasonable inquiry required by [§ 1042].").  The trial court denied the extension request because it did not precede the filing of the complaint.  See McClellan v. Haddock, 2017 VT 13, ¶ 27, 204 Vt. 252, 166 A.3d 579 (concluding that statute "plainly requires that an extension-request precede the filing of the complaint" (emphasis omitted)).

¶ 11.     Defendants subsequently moved to dismiss the medical malpractice claim, citing plaintiff's failure to file a COM simultaneously with her complaint.  The trial court agreed that dismissal ordinarily would be required but questioned if this might be a "rare instance" in which

4

expert testimony was not required. After obtaining additional briefing on this issue, the court denied the motion to dismiss because it could not determine from the face of plaintiff's complaint if the exception applied. This interlocutory appeal followed.

¶ 12. On appeal, defendants argue that dismissal is required because plaintiff failed to comply with 12 V.S.A. § 1042. They reiterate that plaintiff failed to file a COM simultaneously with her complaint and they argue that plaintiff failed to show that this is one of the "rare instances" in which expert testimony is unnecessary. Defendants maintain that the court erred by allowing the claim to proceed without first determining if the exception applied and effectively allowing plaintiff to engage in discovery—after filing its complaint—to investigate the need for expert testimony.

¶ 13. We review the trial court's disposition of a motion to dismiss without deference, using the same standard as the trial court. Skaskiw v. Vt. Agency of Agric., 2014 VT 133, ¶ 6, 198 Vt. 187, 112 A.3d 1277. We assume that "all factual allegations pleaded in the complaint are true, accept as true all reasonable inferences that may be derived from plaintiff's pleadings, and assume that all contravening assertions in defendant[s'] pleadings are false." Clark v. Baker, 2016 VT 42, ¶ 8, 201 Vt. 610, 146 A.3d 326 (quotation omitted).

¶ 14. It is undisputed that plaintiff failed to file a COM simultaneously with her complaint as required by § 1042(a) and thus dismissal is required unless the exception applies. In determining the applicability of the exception, we consider two questions: (1) whether it must be apparent from the face of a plaintiff's complaint that the exception applies; and if so, (2) whether plaintiff's complaint satisfies this requirement. We conclude that the court is limited to the allegations in an initial complaint in determining if the exception applies and that plaintiff's

5

complaint does not present a "rare instance" in which expert testimony is unnecessary. Her medical malpractice claim must therefore be dismissed.

## I. The "Rare Instances" Exception and Discovery

¶ 15. First, we find it clear from the language of the statute, the purpose of the COM requirement, and our case law that a court cannot exempt a plaintiff from the COM requirement unless it affirmatively determines from the four corners of the initial complaint that expert testimony is unnecessary.

¶ 16. As noted above, § 1042(e) provides, "The failure to file the [COM] as required by this section shall be grounds for dismissal of the action without prejudice, except in the rare instances in which a court determines that expert testimony is not required to establish a case for medical malpractice." This language plainly requires an affirmative finding by the court.

¶ 17. Consistent with our case law and the statute's purpose, this determination must be made when the initial complaint is filed. As we explained in McClellan, the COM requirement was adopted in response to concerns that health care providers were being burdened by meritless lawsuits and that the "eventual dismissal" of such suits "was an 'inadequate remedy' for the associated professional and personal costs." 2017 VT 13, ¶ 17. The Legislature required the simultaneous filing of a COM with a medical malpractice complaint to "ensure that claims against health care providers [were] adequately investigated and determined to have merit by a qualified expert before they were filed." Id. ¶ 20 (emphasis added). In light of this purpose, we rejected the argument in McClellan that a complaint could be amended to add a COM. We found this approach "fundamentally inconsistent" with the purpose of the statute and concluded that dismissal of complaints without COMs was "essential to effectuate" the statute. Id. ¶¶ 16, 25.

6

¶ 18. We reiterated this conclusion in <u>Quinlan v. Five-Town Health Alliance, Inc.</u>, emphasizing that the simultaneous-filing requirement is "mandatory and demands strict compliance." 2018 VT 53, ¶ 19, 207 Vt. 503, 192 A.3d 390. In <u>Quinlan</u>, the plaintiff argued that, although he failed to file a COM, he had "substantially complied" with the COM requirement. <u>Id</u>. ¶ 16. We rejected that argument and held that "[w]hen a certificate of merit is <u>entirely omitted</u> from the original complaint, dismissal is necessary to effectuate the statutory purpose of screening out frivolous claims at the outset." <u>Id</u>. ¶ 19 (quotation omitted). "To hold otherwise would eviscerate the certificate of merit requirement and require costly additional litigation to examine whether a plaintiff 'substantially complied' with the law." <u>Id</u>.

¶ 19. It would be equally inconsistent with the statute's purpose to allow a plaintiff who fails to file a COM to proceed with their claim and conduct discovery to determine if their case falls within the narrow exception provided in 12 V.S.A. § 1042(e). The simultaneous filing of a COM with a complaint is a statutory prerequisite for a medical-malpractice case to proceed beyond the complaint. It follows that applicability of the <u>exception</u> to the COM requirement must also be established at the time a complaint is filed and before discovery. That means the exception only applies where the violation of the standard of medical care is apparent to a layperson based on the allegations of the complaint alone. Cf. <u>Taylor v. Fletcher Allen Health Care</u>, 2012 VT 86, ¶ 9, 192 Vt. 418, 60 A.3d 646 (noting exception to common-law rule that plaintiff prove elements of medical negligence through expert testimony "where the violation of the standard of medical care is so apparent to be comprehensible to the lay trier of fact") (citing <u>Senesac v. Assocs. in Obstetrics & Gynecology</u>, 141 Vt. 310, 313, 449 A.2d 900, 902 (1982)).[3]

---

[3] There are no magic words that a plaintiff must include in an initial complaint to invoke the exception under § 1042(e). While it may be helpful to expressly state the intent to invoke the

¶ 20.    This interpretation does not unreasonably burden plaintiffs.  Plaintiffs who need additional time to meet the COM requirement, or to determine if an expert is required to support a claim, can seek an automatic ninety-day extension of the statute of limitations pursuant to § 1042(d) before filing a complaint.  And if the court dismisses a complaint for failure to file a COM, the plaintiff may refile and comply with the COM requirement at any time before expiration of the statute of limitations.  Id. § 1042(e) (directing dismissal "without prejudice").

¶ 21.    The trial court here did not find that this case presented a "rare instance" in which expert testimony was required.  It therefore erred in allowing the claim to proceed.

## II.  Plaintiff's Allegations and the Rare Instances Exception

¶ 22.    We next consider if plaintiff's complaint on its face demonstrates that this is a "rare" case that falls within the exception to the COM requirement.  Defendants maintain that the allegations in plaintiff's complaint clearly demonstrate the need for expert testimony.[4]  According to defendants, plaintiff's claims involve "complex psychiatric/medical issues" that are "plainly not issues within a lay juror's common knowledge and experience," quoting Wilkins v. Lamoille County Mental Health Services, Inc., 2005 VT 121, ¶ 17, 179 Vt. 107, 889 A.2d 245.  They note that plaintiff apparently believed expert testimony was required as well, given her petition to extend time in which to file a COM and her failure to argue at the outset that the exception applied.

---

exception, the court must make its determination of whether expert testimony is required based on the specific allegations in the complaint.  A bare allegation that a case falls within the "rare instances" exception is not alone sufficient to trigger its application, and the absence of such a conclusory allegation does not defeat application of the exception.

[4]  Defendants cite various allegations from plaintiff's second amended complaint, which were not included in the original complaint.  We do not address these arguments because, as noted above, the trial court must determine if a case meets the "rare instances" exception based on the allegations in the initial complaint.

¶ 23. Whether plaintiff's medical malpractice claim requires expert testimony is a question of law that we review without deference. See Tousignant v. St. Louis Cty., 615 N.W.2d 53, 58 (Minn. 2000) (reviewing without deference whether medical malpractice claim required affidavit of expert testimony pursuant to statutory requirement); see also FFE Transp. Servs., Inc. v. Fulgham, 154 S.W.3d 84, 90 (Tex. 2004) (holding that trial court's determination of need for expert testimony to prove negligence claim is legal determination reviewed without deference). We agree with defendants that expert testimony was required here.

¶ 24. To sustain her medical malpractice claim, plaintiff needed to show that the health care providers were "negligent and that the plaintiff's injuries were proximately caused by that negligent conduct." Senesac, 141 Vt. at 313, 449 A.2d at 902. Expert medical testimony is generally required to establish: "(1) the proper standard of medical skill and care; (2) that the defendant's conduct departed from that standard; and (3) that this conduct was the proximate cause of the harm complained of." Id.; see 12 V.S.A. § 1042(a) (requiring submission of COM that certifies plaintiff consulted with health care provider, provider described applicable standard of care, and provider found it reasonably likely that plaintiff could show that standard of care was violated and that violation led to plaintiff's injury). As reflected in the common law, and now by statute, "[a]n exception to this general rule exists in cases where the violation of the standard of medical care is so apparent to be comprehensible to the lay trier of fact." Senesac, 141 Vt. at 313, 449 A.2d at 902 (quotation omitted); see also Taylor, 2012 VT 86, ¶¶ 9-10 (recognizing exception but declining to apply it where claim was "sufficiently complex as to be beyond the scope of common knowledge to a layperson"); H.H. Henry, Necessity of Expert Evidence to Support an Action for Malpractice Against a Physician or Surgeon, 81 A.L.R.2d 597, §§ 2-3 (1962) (recognizing general need for expert testimony in medical malpractice cases and providing

9

examples of rare cases where it is unnecessary, such as when surgeon leaves foreign object inside patient's body during surgery).

¶ 25. Expert testimony is generally required in medical malpractice cases because "the human body and its treatment are extraordinarily complex subjects requiring a level of education, training and skill not generally within our common understanding." Taylor, 2012 VT 86, ¶ 9 (quotation omitted) (alteration omitted). This is particularly true in cases involving suicide. See Wilkins, 2005 VT 121, ¶ 11 (discussing difficulty of proving causation in medical malpractice cases and acknowledging that "difficulties may . . . be uniquely complex and challenging in cases involving suicide, where even under accepted standards of care predictions of suicide are notoriously difficult and compounded by the fact that the patient, unlike other malpractice situations, may be actively working at cross-purposes to the practitioner's goals"); Estate of Joshua T. v. State, 840 A.2d 768, 772 (N.H. 2003) (recognizing that "[s]uicide is not easily explained or understood" and that "[i]ts causes, prevention, triggers and warning signs cannot be readily calculated").

¶ 26. In Wilkins, the plaintiff alleged that an emergency services worker's negligence "in treating [the decedent's] suicidal condition" caused her death. 2005 VT 121, ¶ 1. The plaintiff provided expert testimony that the worker "deviated from professional standards of care" by evaluating the decedent while she "was still groggy," and failing "to conduct an adequate suicide assessment, . . . enter into a written safety contract with [the] decedent, and . . . schedule follow-up appointments with [the] decedent before her discharge." Id. ¶ 4. The plaintiff did not provide expert testimony to "establish[] the requisite causal link between the alleged negligence and [the] decedent's suicide." Id. ¶ 5.

¶ 27.    We concluded that summary judgment was properly granted to the defendant.[5] We emphasized that expert testimony was generally required to establish "the standard-of-care and causation elements of professional negligence claims, . . . and this [was] no less true of claims relating to the negligent treatment or assessment of patients at risk of committing suicide." Id. ¶ 16.    We held that the plaintiff's claim that "[the] defendant deviated from the standard of care, . . . together with the claim that such conduct was the proximate cause of the decedent's suicide," were "plainly not issues within a lay juror's common knowledge and experience" but instead "involve[d] complex psychiatric/medical issues relating to the causes, warning signs, and prevention of suicide." Id. ¶ 17.    We cited cases from other jurisdictions similarly requiring expert testimony for claims related to the negligent treatment or assessment of patients at risk of suicide. See, e.g., Moats v. Preston Cty. Comm'n, 521 S.E.2d 180, 188 (W. Va. 1999) (concluding that expert testimony was required to support claim that defendant was negligent by failing to tell sheriff that individual who had been involuntarily committed was suicidal, explaining that determining if defendant deviated from standard of care "involve[d] complicated medical issues, specifically, the manner and method of protecting someone who is suicidal" that were "not within the common knowledge of lay jurors").

¶ 28.    We conclude that expert testimony is required in the instant case for the same reasons we described in Wilkins.  Health care providers at Northwest State conducted a number of evaluations, placed Mr. Bittner on medication to address his depression, and placed him under mental health watch several times.  They provided information about Mr. Bittner when transferring

---

[5]    The differences between the common-law determination whether expert testimony is required to survive summary judgment, and the question whether the exception to the COM requirement applies to a medical malpractice complaint, arise from the fact that the latter determination is based solely on pleadings—allegations and inferences drawn therefrom—whereas the former determination is based on evidence in a summary judgment record.

him to Northern State, including that he was in active detoxification, on a new medication, and had a mental health diagnosis. Health care professionals at Northern State evaluated Mr. Bittner when he arrived at the facility and scheduled a follow-up appointment with him. Whether individual defendants' evaluations and treatment of Mr. Bittner constituted medical malpractice turns on the standard of care for mental health professionals treating individuals with depression and suicidal ideation, which are not matters of common knowledge and experience.

¶ 29. This is equally true of the causal link between defendants' alleged violations of the standard of care and Mr. Bittner's suicide. We have explained that in medical malpractice cases, as in torts generally, "the plaintiff must prove that as a result of the defendant's conduct the injuries would not otherwise have been incurred, and therefore an act or omission of the defendant cannot be considered a cause of the plaintiff's injury if the injury would probably have occurred without it." Wilkins, 2005 VT 121, ¶ 10 (quotations omitted) (emphasis omitted). Assuming the truth of all the allegations in plaintiff's complaint, no jury could find proximate cause without expert testimony here. See id. ¶ 17 (similarly concluding that cause of decedent's suicide must be established by expert testimony).

¶ 30. We reach the same conclusion with respect to plaintiff's allegation that defendants committed medical malpractice by failing to include a mental health alert in the intra-system transfer note and that their failure to do so proximately caused Mr. Bittner's suicide. The nature and significance of a mental health alert is unexplained. The complaint does not indicate what additional information would have been provided by such an alert beyond that already included in the intra-system note, nor does it explain how the failure to include this alert led to Mr. Bittner's suicide thirteen days after his transfer and ten days after he was examined by defendant Rebbe. As with plaintiff's other allegations, no layperson could determine if the failure to provide a mental

12

health alert deviated from the applicable standard of care or that this violation caused Mr. Bittner's death. This theory of liability, like plaintiff's other allegations, involves "complex psychiatric/medical issues" related to the "causes, warning signs, and prevention of suicide," which require expert testimony. Id.

¶ 31. As § 1042(e) makes clear, it is the "rare" medical malpractice case "[w]here a professional's lack of care is so apparent that only common knowledge and experience are needed to comprehend it." Estate of Fleming v. Nicholson, 168 Vt. 495, 497-98, 724 A.2d 1026, 1028 (1998). The Moats court gave as an obvious example leaving a "loaded gun" in the presence of "a mentally-ill person." 521 S.E.2d at 188 (contrasting facts with obvious example of case that would not require expert testimony). Other courts have found expert testimony unnecessary where, for example, a suicidal patient was placed in a second-floor room with an operable window where the "cause of the accident (. . . the openable window) was not inextricably connected with a course of treatment involving the exercise of medical judgment beyond the common knowledge of laymen," Meier v. Ross Gen. Hosp., 445 P.2d 519, 523 (Cal. 1968), or where a psychiatrist allegedly allowed a decedent to remain in a hospital room with sprinkler pipes from which the decedent had previously attempted to hang himself, which constituted "actionable ordinary negligence" that did not require "reference to professional standards of care," Kerker v. Hurwitz, 558 N.Y.S.2d 388, 390 (N.Y. App. Div. 1990).

¶ 32. There is nothing so obvious here. This case is more akin to Moats, which also involved an alleged negligent failure to convey information about an individual's mental health status between custodians. The Moats court concluded that the case before it "involve[d] complicated medical issues, specifically, the manner and method of protecting someone who is suicidal." Moats, 521 S.E.2d at 188. In that case, the defendant's "potential liability ar[ose] from

13

its duties in relation to the involuntary commitment process," and "[d]espite the plaintiff's attempt to characterize th[e] case as simply a failure to report [the decedent's] suicidal tendencies," the court concluded that "determining whether [the defendant] deviated from the standard of care involve[d] more complex issues that are not within the common knowledge of lay jurors." Id.

¶ 33. Like Moats, this case does not involve the mere failure to "alert" Mr. Bittner's new custodians about his mental health. It involves "complicated medical issues." Id. As discussed above, a layperson would have no way to know what a mental health alert is, why it was needed under the circumstances of this case, and how its omission proximately caused Mr. Bittner's suicide thirteen days after his transfer.

¶ 34. Because this is not a "rare instance" in which expert testimony is unnecessary and because no COM was filed simultaneously with the complaint, plaintiff's medical malpractice claim must be dismissed.

Reversed.

FOR THE COURT:

_____

Associate Justice

¶ 35. **ROBINSON, J., concurring in part, dissenting in part.** I agree with much of the majority's analysis, and join its conclusion that plaintiff was precluded as a matter of law from pursuing his claims against a number of individual defendants who evaluated or treated Mr. Bittner.[6] I respectfully dissent with respect to plaintiff's claims against the Vermont Department

---

[6] Although I part ways with the majority in applying the applicable legal framework to the complaint in this case, I agree that under § 1042(e), the court may only allow a case to proceed beyond the complaint in the absence of a timely filed certificate of merit if it is apparent on the face of the complaint that the "rare instances" exception may apply.

of Corrections (DOC), Centurion of Vermont, LLC (Centurion), and individual defendant Utter because I conclude that the allegations in plaintiff's complaint relating to the information provided to Northern State upon decedent's transfer, and the reasonable inferences drawn from those allegations, present a rare instance in which expert testimony is not required.

¶ 36. As the majority notes, typically in medical malpractice cases a plaintiff must produce expert medical testimony to describe the applicable medical standards, customs, and procedures. See ante, ¶¶ 24-25. But, as the majority recognizes, this Court has long acknowledged an exception to the common-law rule requiring expert testimony in medical malpractice cases "where the violation of the standard of medical care is so apparent to be comprehensible to the lay trier of fact." Senesac v. Assocs. in Obstetrics & Gynecology, 141 Vt. 310, 313, 449 A.2d 900, 902 (quotation omitted).

¶ 37. I agree with the majority that the claims against individual defendants who evaluated and treated Mr. Bittner at Northwest State and then Northern State cannot be proven without expert testimony, ante, ¶ 28, and thus concur in the majority's conclusion that the trial court erred in denying the motion to dismiss plaintiff's medical malpractice claim with respect to claims against defendants Sutton, Supley, Sawyer, Rebbe, Kenton, J. Doe, K. Doe, L. Doe, and M. Doe.

¶ 38. However, plaintiff's initial complaint states a more specific and narrow basis for liability: defendants' failure to include a mental health alert in the intra-system transfer note. Plaintiff alleged in the initial complaint, among other things, that defendants "failed in their duty to provide medical and mental health care which met the standard of care" by "failing to provide adequate mental health treatment at the time of and after his transfer from NWSCF to NSCF" when they "failed to communicate in, or amend to, the Notice of Intra-system Transfer a Mental Health

Alert." The allegation here is not that individual defendants improperly evaluated or predicted Mr. Bittner's risk of suicide, but that defendant Utter and, by extension, Centurion and DOC, knew Mr. Bittner was at risk of suicide and failed to take reasonable steps to prevent it by conveying information about his risk level to personnel at Northern State upon Mr. Bittner's transfer to that facility. I believe that a jury could find based on common knowledge and experience that this failure breached the standard of care and was the proximate cause of Mr. Bittner's death.

¶ 39.  A number of other courts have recognized that where a defendant knows of a particular risk of harm to a person in their care and fails to take reasonable steps to prevent that harm, expert testimony is not necessary to establish liability.  See, e.g., Meier v. Ross Gen. Hosp., 445 P.2d 519, 523 (Cal. 1968) (concluding expert testimony not required where defendant placed decedent in second floor room with fully openable window following attempted suicide, and decedent died after jumping through window); Elledge v. Williamson, 132 So. 3d 432, 439 (La. Ct. App. 2014); (holding expert testimony not required where defendant doctor diagnosed decedent with major depressive disorder and suicidal ideations, was aware of history of self-harm and suicide attempts, and kept decedent in same room where he tried to commit suicide earlier that day and in which he later died by suicide); Kerker v. Hurwitz, 558 N.Y.S.2d 388, 390 (N.Y. App. Div. 1990) (holding expert not necessary to establish liability where plaintiff alleged psychiatrist allowed plaintiff to remain in hospital room with sprinkler pipes from which he previously attempted to hang himself, and that "in cases where there is clear notice of the risk of harm, liability may be imposed without reference to professional standards of care"); Bowman v. Kalm, 2008 UT 9, ¶ 13, 179 P.3d 754 (concluding expert not required to establish that doctor's negligence in prescribing sleeping pills to patient he should have known would abuse them caused her subsequent death due to her resulting clumsiness); Beverly Enters.-Va., Inc. v. Nichols, 441 S.E.2d

1, 3-4 (Va. 1994) (holding no expert required to answer whether reasonably prudent nursing home would permit employees to leave food with unattended patient who had history of choking and could not eat without assistance, nor for jury to infer that negligence caused patient's death).

¶ 40.    In this case, plaintiff alleged that DOC was aware of Mr. Bittner's mental health history based on prior mental health screenings in 2014, 2015, and 2016; mental health providers at Northwest State evaluated Mr. Bittner four separate times from February 5, when he was booked, to February 17, when he was transferred to Northern State and, based on their evaluations, either placed Mr. Bittner in segregated housing or ordered him to remain in segregated housing under fifteen-minute watch because of his expressed suicidal ideations and risk of self-harm; and, the intra-system transfer note that defendant Utter issued in connection with Mr. Bittner's transfer to Northern State did not include a mental health alert.  Based on these allegations, a jury could find even without expert testimony that one or more defendants deviated from the standard of care because they were aware of the risk of harm Mr. Bittner posed to himself, and they failed to take reasonable steps to prevent that harm by communicating critical information about Mr. Bittner's mental state to the provider charged with evaluating him and overseeing any necessary treatment at Northern State.  It does not require an expert in psychological or psychiatric diagnosis and treatment to conclude that a reasonable person processing a transfer of an individual at high risk for self-harm would communicate that risk, and the basis for the assessment, to the receiving facility.

¶ 41.    In addition, I believe that a jury could find proximate cause without expert testimony.  Defendant Rebbe evaluated Mr. Bittner after he was transferred to Northern State and before he died by suicide.  By that time, Mr. Bittner had (just) begun taking antidepressant medication.  During that evaluation, Mr. Bittner did not report any suicidal ideation.  Defendant

17

Rebbe made a plan based on that evaluation. A jury could reasonably conclude that more complete information about Mr. Bittner's recent mental health history would have informed defendant Rebbe's interview of Mr. Bittner, and her development of an appropriate plan, particularly given that Mr. Bittner did not report suicidal ideation at the time he was evaluated. A jury could infer based on common knowledge that had a mental health alert been provided, Rebbe would have been aware of Mr. Bittner's increased risk of suicide, would have questioned him in more detail, and would have taken reasonable steps to protect him, rather than placing him in the general population and prescribing his next follow-up for ninety days after his evaluation. Cf. Kerker, 558 N.Y.S.2d at 390 ("[I]n cases where there is clear notice of the risk of harm, liability may be imposed without reference to professional standards of care."). This theory of liability does not involve "complex psychiatric/medical issues" related to the "causes, warning signs, and prevention of suicide" nor to the diagnosis or treatment of psychological conditions—rather, it involves a failure of mental health professionals to provide an alert regarding a detainee's known history and risk of suicide while in their custody. Wilkins v. Lamoille Cty. Mental Health Servs., 2005 VT 121, ¶ 17, 179 Vt. 107, 889 A.2d 245.

¶ 42. I recognize that this is a close case. The COM requirement imposes an obstacle for plaintiffs at the pleading stage because of the Legislature's desire to preclude meritless medical malpractice claims. See ante, ¶ 17. However, plaintiff does not, at this stage, have to prove her case—the § 1042(e) exception merely requires that the allegations in the complaint, if proven, could support a jury finding of negligence and causation without expert testimony. Cf. Richards v. Town of Norwich, 169 Vt. 44, 48, 726 A.2d 81, 85 (1999) (noting that motion to dismiss for failure to state claim "should not be granted unless it is beyond doubt that there exist no facts or circumstances that would entitle the plaintiff to relief" (quotation omitted)). Because plaintiff has

met that burden here on the theory that defendants failed to include a mental health alert in the intra-system transfer note, I would hold that the trial court did not err in denying the motion to dismiss plaintiff's medical malpractice claim with respect to claims against those defendants allegedly responsible for the failure to communicate more complete information about Mr. Bittner's condition: defendants DOC, Centurion, and Utter.[7]

¶ 43.  I am authorized to state that Chief Justice Reiber joins this concurrence and dissent.

 

 

_____

Associate Justice

---

[7] I agree with the majority that the absence of more detail as to the nature and significance of a "mental health alert" undercuts plaintiff's claim.  But we review this case at the pleadings stage and afford plaintiff the benefit of reasonable inferences—including the inference that a "mental health alert" would have included information highlighting Mr. Bittner's identified risk of self-harm.