# Pearl H. and Jean Marshall v. Milton Water Corporation

[270 A.2d 162]

No. 52-69

Present: Shangraw, Barney and Smith, JJ., and Larrow and Martin, Supr. JJ.

Opinion Filed October 15, 1970

*Coffrin & Pierson,* and *Richard W. Affolter,* Burlington, for Plaintiffs.

*Wick, Dinse & Allen,* Burlington, for Defendant.

**Barney, J.** The plaintiffs' barn was destroyed by fire the day after Christmas, 1964. The volunteer fire department of the town of Milton was unable to get water from the closest hydrant after their tanker ran dry, and switched to pumping from the nearby river. This suit was brought to seek to transfer the burden of the plaintiffs' fire loss, on a claim of negligence, to the Milton Water Corporation, a private company. This defendant provided water from its supply for domestic use and made it available through hydrants it installed and maintained, for fire-fighting purposes, on the basis of a long standing unwritten arrangement with the town. At the close

of all of the evidence the trial court directed a verdict for the defendant company and the plaintiffs are here on appeal.

The cause of the fire is unknown. The barn was within half a mile of the nearest Milton firehouse and sufficiently inside the village area to have one hydrant about 500 feet from the barn, and another some 1000 feet away. The fire department responded promptly on call with a pumper and a tanker of over 1000 gallons capacity. Water from the tanker was directed against flames on the outside of the front wall of the barn. When those flames were knocked down, the fire inside of the barn loft, where baled hay was stacked, was attacked by at least two firemen with hoses. What fire the men could see was put out, but there was still a lot of smoke. The two men inside the loft were directed to stay near the loft door and the ladder because of the smoke, and because the department had no breathing apparatus to use if rescue was required. The men then began removing the bales of hay. The fire chief described the situation at this point this way, "There was a lot more fire in the barn, but because of the smoke we couldn't get in."

A portable pump was discharging the water from the tanker at a rate of about 100 gallons a minute. This meant that the tanker represented roughly eleven minutes of pumping time before it was exhausted. The actual time involved might vary some with intermittent use of the hoses. Connecting the pumper, whose capacity approximated 500 gallons per minute, to the hydrant was a four-minute operation. When the tanker was half empty, that is, had about five and a half minutes of pumping left, the hydrant connection was attempted. The report came back, "No water," so the chief ordered lines laid to the river some 75 feet from the barn and a drafting operation started. This made a more or less unlimited supply of water available and the pumper apparatus was then brought into operation. This required moving hose lines some 800 feet, and the whole process took enough time so that there was a ten or fifteen minute delay in getting water back on the fire.

At the time the tanker ran dry there was a great deal of smoke, but no visual fire. Before the water from the river could be brought to bear, flames broke through the roof on the back side of the barn. Since there was no entrance on this side of the barn, no hoses had been employed here, and the smoke and

lack of breathing apparatus prevented getting to it from the front. The play of water on the barn resumed, but the flames spread. Then the wall supporting the back part of the barn collapsed and let the roof down onto the burning hay bales. After the fire was finally extinguished, the barn was in such condition as to be pretty much useless. It had functioned as a sale stable, with the first floor finished off, painted and fluorescently lighted.

The problem at the hydrant was not that there was no water. The uncontroverted evidence was that the hydrant was dry because most of the valve mechanism had been removed, but that the opening of a valve adjacent to the hydrant would have released water from the two-inch main servicing it into the hydrant itself. The superintendent of the water company testified that about three weeks before the fire, in checking hydrants, he had found this one frozen. When he thawed it out he found it had a broken guide rod and could not be shut off, once opened. This was what required the closing of the valve in the main servicing the hydrant. A long wrench, required to operate the valve, was left in the hydrant box for a time so that water would be available there in case of fire. It was the evidence of the superintendent that about a week later he found the wrench thrown in a ditch, apparently by some children, so he took it home with him to have it available on call. He was not called, although he was a former, long-time volunteer fireman and lived less than a third of a mile from the fire.

The repair or replacement of the hydrant required removing it from the ground. Since the ground at that time of year was frozen, and because there was a danger of greatly drawing down the water supply, it was usual to wait until spring to make such repairs. Ordinarily, spare parts were kept on hand, but the last spares for that type hydrant had been used a few days before. New parts were ordered before the fire, but the delivery time was six to eight weeks. But since the hydrant could not be removed at that time to repair it, the lack of parts made no difference.

The evidence also showed, without dispute, that the hydrant to which connection was attempted, being supplied by a two-inch main, could not successfully have been used in conjunction with the pumper, since its pump would greatly outdraw

the capacity of the pipe. The next hydrant, 500 feet away, was operational, was connected to an eight-inch main and would have been able to withstand the draw of the pumper. No attempt was made to connect to it, there apparently being some doubt about the sufficiency of the available quantity of hose.

Although the superintendent testified, along with another witness, that notice of the condition of the shut-off hydrant was given to the fire chief, that official's testimony left the issue uncertain. However, the chief did give this answer in response to a question asking about the possibility of success if that hydrant had been made to operate, "No, I can't definitely say that we would have saved the barn." He acknowledged that the fire was not out, saying that if you can still observe smoke coming from it, you can pretty well determine there is still fire there.

Theories of liability for water companies to individual property owners for failure to make water available for fires, where hydrants are maintained, vary from the standard of ordinary negligence through gross negligence to near immunity. See, for example, *Doyle* v. *South Pittsburgh Water Co.,* 414 Pa. 199, 199 A.2d 875; *Luis* v. *Orcutt Town Water Co.,* 204 C.A.2d 433, 438, 27 Cal. Rptr. 389; *Moch Co.* v. *Rensselaer Water Co.,* 247 N.Y. 160, 159 N.E. 896, 62 A.L.R. 1199; *Fitch* v. *Seymour Water Co.,* 139 Ind. 214, 37 N.E. 982.

However, no matter what rule of negligence is adopted, and assuming, for the purposes of testing the directed verdict in this case, that the standard is only that of ordinary negligence, the burden of proof on the issue rests on the plaintiffs. They are obligated to present evidence of negligence sufficient to preponderate in their favor, to the satisfaction of a jury. *Gentes* v. *St. Peter,* 105 Vt. 103, 105, 163 A. 569. If the evidence is so tenuous that a verdict based upon it must be set aside, the direction of a verdict is proper. *Langdon-Davies* v. *Stalbird,* 122 Vt. 56, 57–58, 163 A.2d 873; *Burke* v. *Clough, Inc.,* 116 Vt. 448, 452, 78 A.2d 483. It is to be noted that the issue to be proved must be directly supported by some evidence, a burden not overcome by the introduction of facts generating only conjecture, surmise or suspicion. *Dailey* v. *Lawson,* 119 Vt. 82, 85, 119 A.2d 684; *Burke* v. *Clough, Inc., supra,* 116 Vt. 448, 450.

■ The existence of conduct amounting to negligence on the part of the water company is very questionable, and, even more important, the relation of such conduct to the spread of the fire is entirely speculative. The consequences complained of, on the facts, were generated fully as much by a series of choices made by the fire department, correctly or otherwise, as by anything else. The decision to wait to test the hydrant, the decision to go to the closer hydrant on the small main rather than the further one on the adequate main, the choice between drafting from the river and hydrant connection, the uncertainty of the consequences of the connection to the nearer hydrant if it had been turned on, the availability of a valve wrench to make that hydrant serviceable; all these and other imponderables would make any verdict assigning liability for negligence suspect, even in the ordinary case. With proof so inadequate that a jury could make its determination as to causation only by indulging in conjecture, the direction of a verdict on the issue was entirely proper. *Lewis* v. *Vt. Gas Corp.*, 121 Vt. 168, 179, 151 A.2d 297; *Wellman* v. *Wales*, 97 Vt. 245, 255, 122 A. 659.

This result makes it unnecessary to pass upon the other issues raised.

*Judgment affirmed.*