Filed 05/29/24

VERMONT SUPERIOR COURT
CHITTENDEN UNIT
CIVIL DIVISION

| | |
|---|---|
| STATE OF VERMONT,<br> Plaintiff<br><br>v.<br><br>MONSANTO CO., SOLUTIA, INC., and<br>PHARMACIA LLC,<br> Defendants | Docket No. 23-CV-2606 |

## RULING ON DEFENDANTS' MOTION TO DISMISS

The State of Vermont claims that Defendants Monsanto Co., Solutia, Inc., and Pharmacia LLC are responsible for the widespread contamination of and harm to State natural resources and Vermont schools from polychlorinated biphenyls ("PCBs"). The State asserts various common law claims, including public and private nuisance, trespass, strict products liability, and negligence, as well as statutory claims. Defendants move to dismiss, arguing that the court lacks jurisdiction and that the First Amended Complaint fails to state a claim under V.R.C.P. 12(b)(6). The court heard oral argument on the motion on April 29, 2024.

### Facts

The following facts are alleged in the First Amended Complaint ("Complaint"). The court makes no findings as to their accuracy.

Defendants Monsanto Co., Solutia, Inc., and Pharmacia LLC have succeeded to the liabilities of an earlier Monsanto entity, also named Monsanto Company and referred to in the filings as "Old Monsanto." PCBs are toxic and dangerous chemical compounds that were manufactured, marketed, sold, and distributed by Old Monsanto in the United

States from approximately 1929 to 1977. During that period, Old Monsanto was responsible for the manufacture of 99% or more of all PCBs used or sold within the United States. There are no known natural sources of PCBs.

PCBs contaminate many natural resources throughout Vermont. Although PCBs were banned in the late 1970s, PCBs are highly persistent and continue to circulate in the State's waters and other natural resources. PCBs have accumulated to dangerous levels in sediment, in wildlife, and in fish, among other resources. All ten sections of Lake Champlain and the entire 7-mile reach of the Hoosic River are considered impaired by PCBs on Vermont's most current 303(d) Impaired Waters List. Because of this, Vermont has a fish consumption advisory for all of Lake Champlain and the Hoosic River. The accumulation of PCBs in natural resources, and fish in particular, poses a public health threat to Vermont citizens. The Amended Complaint also lists 82 other specific PCB-contaminated sites throughout the state. Am. Compl. ¶ 189.

PCBs also affect schools in Vermont. For structures built prior to 1980, PCBs from construction materials leach and off-gas, resulting in indoor air contamination. This is particularly dangerous to children and adolescents, who are more susceptible to PCBs' neurodevelopmental impacts than adults. Numerous Vermont schools have tested at high levels of concern for PCB contamination, and the State is spending millions of dollars on current statewide testing of all schools (over 300 schools). The Amended Complaint alleges that at least 18 specific schools are contaminated above certain "action levels." Am. Compl. ¶ 195.

For decades, Old Monsanto knew that its commercial PCB formulations were highly toxic and would inevitably produce contamination and human health risks. Yet Old Monsanto misled the public, regulators, and its own customers about these key facts,

maintaining that its PCB formulations were safe, were not environmentally hazardous, and did not require any special precautions for use or disposal. To this day, Defendants continue to deny that Old Monsanto's PCB products pose a legitimate human health or environmental safety hazard that warrants action to remove PCBs from the environment.

When it manufactured, marketed, distributed, and sold commercial PCB formulations, often under the trade name "Aroclor," Old Monsanto knew that its PCBs were highly toxic, harmful to human and animal health, and environmentally harmful. Internally, the company acknowledged as early as 1937 that prolonged exposure to PCBs produced systemic toxic effects. In the 1950s, Old Monsanto's Medical Office specifically advised workers not to eat lunch in the PCB department. Old Monsanto's medical director openly declared that "[w]e know Aroclors are toxic."

Old Monsanto knew that its PCB formulations would inevitably volatilize and leach, leak, and escape their intended applications, contaminating runoff during naturally occurring storm and rain events and entering waterways, water bodies, sediment, soils, and plants, as well as fish and other wildlife throughout Vermont. It also knew that PCBs persist in the natural environment rather than break down over time, and that PCBs accumulate and build up over time in animal tissue, including in fish and humans. As a result, over time, PCB contamination poses an increasingly hazardous threat to the health of Vermont's citizens.

Despite this knowledge, Old Monsanto sold its PCB products for a variety of uses, including household uses. PCBs were sold for use in paints, caulks, inks, dyes, paper products, lubricants, sealants, plasticizers, coolants, hydraulic fluids, fireproofing, and industrial electrical equipment such as capacitors and transformers, among other

applications. Old Monsanto also manufactured and sold various products incorporating its PCB formulations.

According to Old Monsanto's internal documents, the company deliberately decided to keep selling PCB mixtures despite the company's awareness of the potential for mass contamination. For example, in 1969, Old Monsanto admitted internally that there was "little probability that any action that can be taken will prevent the growing incrimination of specific polychlorinated biphenyls . . . as nearly global environmental contaminants leading to contamination of human food (particularly fish), the killing of some marine species (shrimp), and the possible extinction of several species of fish eating birds." Am. Compl. ¶ 10. Monsanto acknowledged that there was "no practical course of action" to prevent this mass contamination, but still insisted on taking steps "to prolong the manufacture, sale and use of these particular Aroclors as well as to protect the continued use of other members of the Aroclor series." Id. Another internal Monsanto document explained: "there is too much customer/market need and selfishly too much Monsanto profit to go out." Id.

### Discussion

Defendants move to dismiss the complaint in its entirety. They contend that this court lacks both subject matter and personal jurisdiction, and that the complaint fails to state a claim on which relief can be granted.

### I.     Subject Matter Jurisdiction

When considering a motion to dismiss for lack of subject matter jurisdiction, "'all *uncontroverted* factual allegations of the complaint [are] accepted as true and construed in the light most favorable to the nonmoving party.' 'A court may consider evidence outside the pleadings.'" Mullinnex v. Menard, 2020 VT 33, ¶ 8, 212 Vt. 432 (citations

omitted; emphasis added). Defendants contend that there is no subject matter jurisdiction because the State lacks standing. "[T]o have standing, a plaintiff must 'have suffered a particular injury that is attributable to the defendant and that can be redressed by a court of law.'" Ferry v. City of Montpelier, 2023 VT 4, ¶ 12 (quoting Parker v. Town of Milton, 169 Vt. 74, 77 (1998). Under that test, a plaintiff first must be able to show "injury in fact," meaning "the invasion of a legally protected interest." Id. ¶ 13 (citation omitted).

Defendants contend that the State has not properly pled an injury for most of the listed sites. Specifically, they argue that the State alleges the mere "presence" of PCBs, but not actual harm: "the Complaint contains no non-conclusory allegations regarding (1) the level of PCBs at these sites, (2) the level at which the State deems a site 'contaminat[ed],' or (3) the level at which PCBs would give rise to an actual harm at these locations." Mot. to Dismiss at 10. Defedants cite several cases to support this argument. *See*, *e.g.*, Emerald Coast Utilities Auth. v. 3M Co., 746 F. Supp. 2d 1216, 1228 (N.D. Fla. 2010) (no injury for standing purposes where "not only did the contamination levels not exceed the [maximum contaminant level], but additional undisputed facts show[ed] that [plaintiff] ha[d] not suffered any injury as a result of the presence of these chemicals in its water supply"). Emerald Coast, however, was a summary judgment decision and is therefore inapposite. The other cases Defendants rely on fare no better. *See* Town of Westport v. Monsanto Co., 877 F.3d 58, 66 (1st Cir. 2017) (summary judgment); Lewis v. FMC Corp., 786 F. Supp. 2d 690, 713 (W.D.N.Y. 2011) (summary judgment); Rockwell Int'l Corp. v. Wilhite, 143 S.W.3d 604, 621 (Ky. Ct. App. 2003) (post-jury verdict and judgment).

Defendants cite one decision addressing a motion to dismiss, City of Greenville, Ill. v. Syngenta Crop Prot., Inc., 756 F. Supp. 2d 1001, 1007 (S.D. Ill. 2010), but that case

seems to support the State's position. The Greenville court denied the motion to dismiss, noting that the plaintiff had "allege[d] that the presence of [the contaminant] in their raw water sources has required or will require them to perform additional testing and monitoring beyond their routine testing and monitoring and to install and operate special systems to filter atrazine from the raw water," and that the burden would obviously be different at a future summary judgment stage. Id. at 1007–08.

It is enough at the pleading stage that the State has alleged harm generally. *See* Am. Compl. ¶ 217 (alleging that State has "suffered harm of a kind different from that suffered by members of the general public, including incurrence of costs to investigate, monitor, analyze, and otherwise respond to PCB contamination in natural resources, and to investigate, monitor, analyze, and otherwise respond to PCB contamination in Vermont schools."); ¶ 225 (alleging harm to natural resources and Vermont schools), ¶ 267 ("Plaintiff's natural resources and Vermont schools are contaminated with PCBs"). Defendants have identified no requirement that the State allege specific details of the harm at every contaminated site. *See* Rhode Island v. Atl. Richfield Co., 357 F. Supp. 3d 129, 136 (D.R.I. 2018) (rejecting defendants' argument that the state failed to meet the notice pleading standard because the Complaint did not identify specific contamination sites); State v. 3M Co., No. 547-6-19 Cncv, 2020 WL 13368654, at *6 (Vt. Super. Ct. May 28, 2020) ("the State generally alleges injuries and the details of those injuries are a proper subject for discovery but not a mandated element of the complaint") (citation omitted). While the State might have to show more than the "mere presence" of PCBs at particular sites to prevail at summary judgment and trial, it need not plead particular contaminant levels in its complaint. *See* In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig., 725 F.3d 65, 105 (2d Cir. 2013) ("for standing purposes, the [state's maximum

contaminant level] does not define whether injury has occurred"); LaFleur v. Whitman, 300 F.3d 256, 270–71 (2d Cir. 2002) (holding that plaintiff may suffer injury-in-fact from air pollution that falls below federal regulatory pollution thresholds, and noting that "[t]he injury-in-fact necessary for standing need not be large, an identifiable trifle will suffice.") (quotation omitted).

Defendants further argue that the State has not pled that it has suffered an injury sufficient to support damages tied to property ownership. Mot. to Dismiss at 12–13. The State has clarified both in its opposition and at oral argument that it does not seek damages related to private property interests. The State has alleged harm to natural resources and schools, and seeks damages for costs it has incurred to conduct testing, monitoring, and remediation. Again, the exact details and scope of damages are not matters to be decided on a motion to dismiss. Defendants' argument that this will unduly burden the discovery process is unfounded. Defendants can simply ask the State to identify all sites for which it seeks damages, and the nature of damages sought for each site.

Defendants next contend that the State has not pled the second element of standing: traceability, or "causation." Hous. Our Seniors in Vermont Inc. v. Agency of Com. & Cmty. Dev., 2024 VT 12, ¶ 13; Turner v. Shumlin, 2017 VT 2, ¶ 11, 204 Vt. 78 ("there must be a causal connection between the injury and the conduct complained of"). Defendants maintain that Old Monsanto was not responsible for manufacturing the "finished products from which the PCBs originated, for the decision to use . . . these PCB-containing products at particular sites in Vermont, or for the decision to dispose of [them] at particular sites in Vermont." Mot. to Dismiss at 13–14.

7

The Complaint alleges that Old Monsanto manufactured virtually all PCBs made in the United States, shipped millions of pounds of PCBs to Vermont, hid its knowledge of PCBs dangerous properties starting in the 1930s, and instructed customers and end-users to dispose of PCBs in ways that it knew would cause mass contamination. Am. Compl. ¶¶ 2, 12, 45, 77, 81, 114–44, 178. That is more than sufficient to trace the alleged harms from PCB contamination back to Old Monsanto for purposes of establishing standing at the pleading stage.

## II.    Personal Jurisdiction

Next, Monsanto contends that the court lacks personal jurisdiction over Defendants. "Vermont's long-arm statue, 12 V.S.A. § 913(b), permits state courts to exercise jurisdiction over nonresident defendants 'to the full extent permitted by the Due Process Clause' of the U.S. Constitution." Fox v. Fox, 2014 VT 100, ¶ 9, 197 Vt. 466 (quoting Northern Aircraft, Inc. v. Reed, 154 Vt. 36, 40 (1990)). There are two essential prongs to the personal jurisdiction inquiry: whether the defendant has "minimum contacts" with the state, and whether it is fair and reasonable to subject him or her to suit in this jurisdiction. Some cases break this down, and some discuss the issues as part of a single inquiry. The overall question is whether "the defendant's conduct and connection with the forum state are such that he should reasonably anticipate being haled into court there." Northern Aircraft, Inc. v. Reed, 154 Vt. 36, 41 (1990). "This reasonableness requirement is met when the defendant purposefully directs activity toward residents of a forum state and the litigation arises out of, or relates to, that activity. The reasonableness requirement also prevents a defendant from being subjected to jurisdiction on the basis of fortuitous, attenuated, or random contacts." Dall v. Kaylor,

163 Vt. 274, 276 (1995), (*citing* Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472, 475 (1985); Northern Aircraft, 154 Vt. at 41–42).

Monsanto argues that the named Defendants lack claim-related forum contacts. However, the State alleges that all three named Defendants are successor entities that assumed the liabilities of Old Monsanto's manufacture and sale of PCBs. Am. Compl. ¶¶ 27–33. This is an established doctrine of successor liability. *See* Ostrowski v. Hydra-Tool Corp., 144 Vt. 305, 307, 479 A.2d 126, 127 (1984) (explaining "general and traditional rules of corporate successor liability"); State v. 3M Co., No. 547-6-19 Cncv, 2020 WL 13368654, at *7 (Vt. Super. Ct. May 28, 2020) (Toor, J.); *see also* Transfield ER Cape Ltd. v. Indus. Carriers, Inc., 571 F.3d 221, 224 (2d Cir. 2009) ("[F]ederal courts have consistently acknowledged that it is compatible with due process for a court to exercise personal jurisdiction over an individual or a corporation that would not ordinarily be subject to personal jurisdiction in that court when the individual or corporation is an alter ego or successor of a corporation that would be subject to personal jurisdiction in that court.") (quotation omitted); LiButti v. United States, 178 F.3d 114, 123 (2d Cir. 1999) ("when a person is found to be a successor in interest, the court gains personal jurisdiction over them simply as a consequence of their status as a successor in interest, without regard to whether they had any other minimum contacts with the state.").

Monsanto also argues that Old Monsanto lacks sufficient contacts with Vermont. The State, however, alleges that Old Monsanto sold more than five million pounds of PCBs to Jard Company in Bennington, and that Old Monsanto also shipped to many other customers within Vermont. Am. Compl. ¶ 178. The State also alleges that Old Monsanto, "in conjunction with its significant sales into Vermont, . . . advised customers to dispose of liquid PCB wastes directly into sewers despite knowing that this would directly

9

introduce PCBs into surface waters, and to vent PCB vapors to the atmosphere despite knowing that this would directly introduce PCBs into air, soils, and surface waters." Id. ¶ 179. This plainly constitutes more than mere "fortuitous, attenuated, or random contacts," and satisfies the test for sufficient contacts for purposes of personal jurisdiction. *See* State v. Atl. Richfield Co., 2016 VT 22, ¶¶ 14–15, 201 Vt. 342.

### III. Rule 12(b)(6)

#### A. Foreseeability

Monsanto next argues that, as part of the causation analysis, the complaint fails to allege the foreseeability necessary to state a claim as to all counts. "[C]ausation requires both 'but-for' and proximate causation." Collins v. Thomas, 2007 VT 92, ¶ 8, 182 Vt. 250. As to "but-for" causation, "the plaintiff must [] show that the harm would not have occurred 'but for' the defendant's conduct such that the 'tortious conduct [was] a necessary condition for the occurrence of the plaintiff's harm.'" Collins v. Thomas, 2007 VT 92, ¶ 8, 182 Vt. 250 (quoting Wilkins v. Lamoille Cnty. Mental Health Servs., Inc., 2005 VT 121, ¶ 13, 179 Vt. 107). As to proximate causation, the plaintiff must "show that the defendant's negligence was 'legally sufficient to result in liability,' such that 'liability attaches for all the injurious consequences that flow [from the defendant's negligence] until diverted by the intervention of some efficient cause that makes the injury its own.'" Id. (quoting Black's Law Dictionary 234 (8th ed. 2004); Beatty v. Dunn, 103 Vt. 340, 343 (1931)). "Proximate cause is the law's method of keeping the scope of liability for a defendant's negligence from extending by ever-expanding causal links." Estate of Sumner v. Dep't of Soc. & Rehab. Servs., 162 Vt. 628, 629 (1994). "[T]he hallmark feature of proximate causation, and what distinguishes it from but-for causation, is reasonable foreseeability." State v. Baker, 2017 VT 91, ¶ 10, 205 Vt. 569; *see also* Dobbs, The Law of

Torts § 198 (2d ed.) ("The most general and pervasive approach to . . . proximate cause holds that a negligent defendant is liable for all the general kinds of harms he foreseeably risked by his negligent conduct and to the class of persons he put at risk by that conduct."); id. § 205 ("courts usually reduce the test[] of . . . proximate cause . . . to a question of foreseeability.").[1]

Proximate cause is "ordinarily" a jury issue, but "may be decided as a matter of law where "the proof is so clear that reasonable minds cannot draw different conclusions." Collins, 2007 VT 92, ¶ 8. While causation cannot be proved by mere speculation, conjecture, or surmise, *see* Marshall v. Milton Water Corp., 128 Vt. 609, 612–13 (1970), it can be proved through rational inferences drawn from circumstantial evidence. *See* Travelers Ins. Companies v. Demarle, Inc., USA, 2005 VT 53, ¶ 10, 178 Vt. 570.

The Amended Complaint adequately alleges foreseeability. It alleges that Monsanto had knowledge of the toxicity and dangers of PCBs as early as the 1930s, with increasing knowledge through the 1960s. In 1969, a Monsanto committee "acknowledged that normal and intended uses of PCB-containing products were the cause of [] widespread contamination: In one application alone (highway paints), one million lbs/year are used. Through abrasion and leaching we can assume that nearly all of this Aroclor winds up in the environment." Am. Compl. ¶105 (quotation omitted). Monstanto seeks to minimize the extent of its knowledge, but the court must accept the facts alleged

---

[1] The State contends that foreseeability is not part of proximate cause, citing Dodge v. McArthur, 126 Vt. 81, 83 (1966). That argument is not persuasive. While the court agrees that the term "proximate cause" has been used confusingly in the caselaw, Dodge and the cases citing it appear to use "proximate cause" to mean factual causation. *See*, *e.g.*, Finnegan v. State, 138 Vt. 603, 605–06 (1980) ("Whether the alleged negligence was the proximate cause of plaintiff's damages is simply a question of whether that alleged negligence was the cause-in-fact of those damages.") (citing Dodge, 126 Vt. at 83).

in the complaint for purposes of the Rule 12(b)(6) motion to dismiss. Monsanto can explore the exact nature and scope of its knowledge in discovery.

B. Duty

As to the negligence claim (Count 6), Monsanto contends that the State has failed to allege that Old Monsanto had a duty to the State. Specifically, it argues that the State has not alleged "a legal relationship linking one party to the other." Fleurrey v. Dep't of Aging & Indep. Living, 2023 VT 11, ¶ 17. Monsanto argues that although Old Monsanto sold PCBs to third-party manufacturers who in turn incorporated those PCBs into their finished products, any relationship Old Monsanto had to the State itself and third parties within the state who bought finished products that contained PCBs is far too attenuated.

"Ultimately, whether a duty exists is a question of fairness that depends on, among other factors, the relationship of the parties, the nature of the risk, and the public interest at stake." Hamill v. Pawtucket Mut. Ins. Co., 2005 VT 133, ¶ 6, 179 Vt. 250; *see also* Langle v. Kurkul, 146 Vt. 513, 519 (1986) (listing numerous factors including "considerations of public policy."). "[T]he foreseeability of the harm" is also an important factor in this analysis. Deveneau v. Wielt, 2016 VT 21, ¶ 8, 201 Vt. 396; Dobbs, The Law of Torts § 256 (2d ed.) ("A defendant whose conduct causes harm to another is not ordinarily responsible in tort unless a reasonable person in his position would have recognized the risk of harm. This means that liability is not imposed unless harm would have been foreseeable to a reasonable person.").

Monsanto relies on a recent case where the Vermont Supreme Court stated that "a legal relationship must be alleged between parties before a court may reach the question of duty." Fleurrey v. Dep't of Aging & Indep. Living, 2023 VT 11, ¶ 16; *see also* id. ¶ 17 ("legal duties are dependent upon and coextensive with legal relationships") (citing Haupt

v. Triggs, 2022 VT 61, ¶ 12; Deveneau v. Wielt, 2016 VT 21, ¶ 18, 201 Vt. 396). Monsanto apparently interprets Fleurrey as imposing a privity requirement for establishing a legal duty. Monsanto reads Fleurrey far too broadly. Fleurrey and the cases cited therein present special circumstances not applicable here. Fleurrey was a premises liability case brought under Restatement (Second) of Torts § 343, and its statement about legal relationships is properly understood as limited to those circumstances. *See* Fleurrey, 2023 VT 11, ¶ 14 ("For § 343 claims to survive dismissal motions, plaintiffs must allege legal relationships linking land possessors to either plaintiffs or plaintiffs' decedents."). Deveneau was another premises liability case, brought under Restatement § 379A, where the landlord had "expressly disavowed any responsibility" for the circumstances that caused the injury. Deveneau, 2016 VT 21, ¶ 18. And Haupt involved a claim for implied indemnity which, as is well established, "'will apply only when the party seeking indemnity is vicariously or secondarily liable to the third person *because of a legal relationship* with the third person or because of the party's failure to discover a dangerous condition caused by the indemnifying party.'" Haupt, 2022 VT 61, ¶ 10 (emphasis added) (quoting Hemond v. Frontier Commc'ns of Am., Inc., 2015 VT 67, ¶ 11, 199 Vt. 272).

Moreover, it is blackletter law that "[l]iability in negligence is not necessarily dependent on a preexisting privity in legal relationship between such persons." 65 C.J.S. Negligence § 43. Rather, "[t]he duty to exercise ordinary care to guard against injury which naturally flows as a reasonably probable and foreseeable consequence of an act does not depend upon contract, privity of interest, or the proximity of relationship but extends to remote and unknown persons." Id.; *see, e.g.*, Restatement (Second) of Torts § 4 cmt. (a) (1965) ("One who digs a ditch in a public highway is under a duty to set lights around it as night approaches so as to give travelers warning of its existence."). As noted

at oral argument, Monsanto's reading of <u>Fleurrey</u> would upend well-settled negligence principles in scenarios involving, for example, a negligent driver who injures other drivers or pedestrians who are otherwise strangers. The complaint sufficient alleges that Monsanto owed a legal duty to the State of Vermont and its citizens despite the absence of a legal relationship.

## C.  Public Nuisance

The State alleges public nuisance in Count 1. "A public nuisance is an unreasonable interference with a right common to the general public. To be considered a public nuisance, an activity must disrupt the comfort and convenience of the general public by affecting some general interest." <u>State v. Howe Cleaners, Inc.</u>, 2010 VT 70, ¶ 49, 188 Vt. 303 (brackets and quotations omitted); *see also*, *generally*, <u>Napro Dev. Corp. v. Town of Berlin</u>, 135 Vt. 353, 357 (1977). "Circumstances that may sustain a holding that an interference with a public right is unreasonable include . . . Whether the conduct involves a significant interference with the public health, the public safety, the public peace, the public comfort or the public convenience." Restatement (Second) of Torts § 821B(2).

The State claims that Monsanto's conduct in manufacturing, selling, and promoting PCBs and PCB-containing products has caused environmental and indoor air contamination, property damage, and unreasonable health risks. Am. Compl. ¶ 201. Specifically, the State identifies surface waters, fish, soils, sediments, wildlife, indoor air and surfaces, concrete foundations, and other building components in school buildings as examples of the natural and public resources affected. <u>Id</u>. ¶¶ 202–03. This, the State claims, has interfered with the public's right to safely and comfortably use and enjoy Vermont's natural resources and schools "for customary purposes, without obstruction or health hazard." Am. Compl. ¶ 215.

Monsanto argues that this claim fails because the State has not alleged that Old Monsanto controlled any finished products that contained PCBs. This court has already rejected a similar argument in other cases. *See*, *e.g.*, State v. 3M Co., No. 547-6-19 Cncv, 2020 WL 13368654, at *3 (Vt. Super. Ct. May 28, 2020); State v. Cardinal Health, Inc., No. 279-3-19 Cncv, slip copy at 8–9 (Vt. Super. Ct. May 12, 2020). As the court observed in those earlier cases, language in the Restatement suggests that a defendant may be held liable for harm that continues after that defendant's actions have ceased, and that substantial participation in a chain of actions can be sufficient. *See* Restatement (Second) of Torts § 834 cmts (d) and (e); *see also* In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig., 725 F.3d 65, 121 (2d Cir. 2013) (rejecting similar argument by gasoline manufacturer/supplier); Burlington Sch. Dist. v. Monsanto Co., No. 2:22-CV-215, 2023 WL 4175344, at *6 (D. Vt. June 26, 2023) (also rejecting "control" argument raised by Monsanto in case brought by Burlington School District). Monsanto offers no persuasive basis to reach a different result here.

### D.  Private Nuisance and Trespass

The State alleges private nuisance in Count 2 and trespass in Count 5. Because these claims present overlapping issues, the court addresses them together.

These claims turn on allegations related to natural resources such as surface waters, fish, wildlife, and soils as well as public schools. Amended Complaint ¶¶ 221-227, 257-70. A private nuisance is "a substantial and unreasonable interference with a person's interest in the use and enjoyment of land." Jones v. Hart, 2021 VT 61, ¶ 26, 215 Vt. 258; *see also*, *generally*, Post & Beam Equities Grp., LLC v. Sunne Vill. Dev. Prop. Owners Ass'n, 2015 VT 60, ¶¶ 24–25, 199 Vt. 313; Restatement (Second) of Torts §§ 821D, 822. Trespass is an invasion of one's interest in the exclusive *possession* of his or her land.

15

John Larkin, Inc. v. Marceau, 2008 VT 61, ¶ 8, 184 Vt. 207 (citing W. Keeton et al., Prosser and Keeton on the Law of Torts § 87, at 622 (5th ed.1984); Restatement (Second) of Torts § 158 cmt. c, at 277 (1965)). "Liability for trespass arises when one intentionally enters or causes a thing to enter the land of another." *See* Canton v. Graniteville Fire Dist. No. 4, 171 Vt. 551, 552 (2000) (citing Restatement (Second) of Torts § 158(a)). The entry must be "unprivileged," meaning that the "trespass involves conduct that the trespasser has no right to engage in." Ondovchik Family Ltd. P'ship v. Agency of Transp., 2010 VT 35, ¶ 10, 187 Vt. 556 (emphasis and quotation omitted).

Monsanto argues that the private nuisance and trespass claims both fail because the State has not alleged an exclusive possessory interest in the properties.[2] The court rejected a similar argument in 3M as to private nuisance. As the court explained there: "That argument overlooks the role of the State in a *parens patriae* claim, in which it asserts the rights of its citizens. *Parens patriae . . .* does not require state ownership of such resources." 3M, 2020 WL 13368654, at *4 (quotation omitted); *see also* id. at *6 ("a claim made by the State in its *parens patriae* capacity can assert the rights of its citizens to seek abatement of a broadly-disseminated nuisance"); State v. Hess Corp., 20 A.3d 212, 216 (N.H. 2011) (concluding that "the State is not precluded from recovering damages related to MTBE contamination in a privately owned well"). But the court agreed with 3M's "possessory interest" argument as to the trespass claim, and dismissed the trespass claim on that basis. 3M, 2020 WL 13368654, at *5. Here, Monsanto argues for a different

---

[2] Monsanto also argues that these claims fail because Old Monsanto did not control any finished products that contained PCBs. The court rejects this control argument for the same reasons discussed above and in 3M. Monsanto further contends that the trespass claim fails for lack of a tangible invasion. As this court ruled in 3M, the Supreme Court has noted that Vermont law is silent on that issue, and expressly left it for another day. It is therefore not a basis for dismissal. 3M, 2020 WL 13368654, at *5.

outcome on the private nuisance claim, but the same outcome on the trespass claim. The State wants a different outcome as to trespass, but the same as to private nuisance.

The States claims rely on two doctrines—public trust and *parens patriae.* Amended Complaint ¶¶ 19-20. "The public trust doctrine provides that the government holds public lands, waters and other natural resources in trust for the benefit of its citizens." State v. 3M Co., No. 547-6-19 CNCV, 2020 WL 13368654, at *2 (Vt. Super. Ct. May 28, 2020) (quotation omitted). The State thus has a "duty" to manage public trust resources "for the benefit of all the people." Id. (quotation omitted).

"'*Parens patriae*,' literally 'parent of the country,' refers traditionally to [the] role of [the] state as sovereign and guardian of persons under legal disability," and is "inherent in the supreme power of every State, . . . often necessary to be exercised in the interests of humanity, and for the prevention of injury to those who cannot protect themselves." Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez, 458 U.S. 592, 600 & n.8 (1982) (quotation omitted). It has developed as a standing concept in American law: "to have such standing the State must assert an injury to what has been characterized as a 'quasi-sovereign' interest," which refers to "a set of interests that the State has in the well-being of its populace." Id. at 601–02. The U.S. Supreme Court has recognized that "a State has a quasi-sovereign interest in the health and well-being—both physical and economic—of its residents in general." Id. at 607; *see also*, *generally*, Annot., "State's Standing to Sue on Behalf of its Citizens," 42 A.L.R. Fed. 23; 72 Am. Jur. 2d States, Etc. §§ 92–93; Wright & Miller, 13B Fed. Prac. & Proc. Juris. § 3531.11.1 (3d ed.) ("There can be no doubt whatever that in its own courts and under its own law, a state has standing to enforce broad concepts of the public interest against individual defendants, whether through criminal or civil proceedings."). "*Parens patriae* . . . may provide a state with standing to

bring suit to protect a broader range of natural resources than the public trust doctrine because it does not require state ownership of such resources." State v. Hess Corp., 20 A.3d 212, 216 (N.H. 2011) (citing New Mexico v. General Elec. Co., 467 F.3d 1223, 1243 n. 30 (10th Cir.2006)).

The public trust doctrine properly supports claims made as to land and waters that are publicly owned, such as Lake Champlain and the Hoosic River. *Parens patriae* might properly underlie claims made as to public schools and privately owned sites. The State certainly has a quasi-sovereign interest in the health and safety of students enrolled in schools. Additionally, the State might have a quasi-sovereign interest in ensuring that privately owned properties are free from harmful contamination, given that such sites might attract numerous public visitors or represent widespread PCB contamination throughout the state, though damages available to the State related to such sites would obviously be limited.

Whether a State can bring a private nuisance or trespass claim for environmental contamination to property it does not own is plainly an unsettled area of law. Recent case law (regarding trespass particularly) seems to support the State's theory. *See*, *e.g.*, Illinois ex rel. Raoul v. Monsanto Co., 2023 WL 3292591, at *3 (N.D. Ill. May 5, 2023) ("In its capacities both as trustee and parens patriae, the State has the authority and obligation to protect the people's natural resources" by bringing a trespass claim for PCB contamination); New Jersey Dept. of Environmental Protection v. Monsanto Co., 2023 WL 9420336, at *11 (N.J. Super. L. Aug. 04, 2023) (concluding that "the Public Trust

18

Doctrine trumps the exclusivity element of a trespass claim").[3] Two other cases reach the same conclusion as to a different contaminant. *See* Rhode Island v. Atl. Richfield Co., 357 F. Supp. 3d 129, 144 (D.R.I. 2018) ("Here, the State — properly proceeding as parens patriae — may also protect its pseudo-sovereign interest in the welfare of its citizens and integrity of its natural resources. One way it may do so is seeking relief for the invasion of its citizens' possessory interests by MTBE in an action for trespass. While possessory interests are usually for individual owners themselves to protect, when the harm to such interests is as widespread as alleged in the State's complaint, it counts as injury not just to the affected individuals, but to the state as a whole."); State v. City of Dover, 891 A.2d 524, 527, 530 (N.H. 2006) (concluding that state had "*parens patriae* standing to bring contamination suits," including trespass claims, "against the MTBE defendants on behalf of the residents of New Hampshire").

Several other courts, however, have dismissed trespass claims in similar environmental contamination cases. *See*, *e.g.*, State ex rel. Jennings v. Monsanto Co., 299 A.3d 372, 389 (Del. 2023) ("the State does not have exclusive possession of land it holds in trust"); New Jersey Dep't of Env't Prot. v. Hess Corp., No. A-2893-18T2, 2020 WL 1683180, at *6 (N.J. Super. Ct. App. Div. Apr. 7, 2020) (public trust doctrine "does not grant to the State the exclusive possession of property"); State v. Exxon Mobil Corp., 406 F. Supp. 3d 420, 470–71 (D. Md. 2019) ("the State does not identify any cases in which Maryland courts have found that its quasi-trustee interest in its natural resources, or

---

[3] Two other cases have also denied motions to dismiss trespass claims brought in PCB contamination cases against Monsanto, though the two older cases are not as persuasive. *See* State v. Monsanto Co., No. 18CV00540, 2019 WL 11815008, at *8 (Or. Cir. Jan. 09, 2019) (stating that "State of Oregon must allow some use of public trust lands and waterways," but "also . . . enjoys the right to exclude other uses, and to bring actions to recover for such trespasses" under specific state statutes); State v. Monsanto Co., No. A 18 01237, 2018 WL 11431406, at *3 (Ohio Com. Pl. 2018) (allowing trespass claim, but not addressing "exclusive possession" argument).

proceeding *parens patriae*, confers the requisite possessory interest to sustain a *trespass* claim"); New Mexico v. Gen. Elec. Co., 467 F.3d 1223, 1248 n.36 (10th Cir. 2006) ("the State as guardian of the public trust has no possessory interest in the sand, gravel, and other minerals that make up the aquifer—a necessary requisite to maintaining a trespass action").

While the court previously held in the 3M case that the State could not bring a trespass claim, the developing law in this area and additional argument from the State here causes the court to question its ruling. It is certainly arguable that the State is like a party with shared possession of land: each co-owner would have the right to sue for trespass. The State's role is different in kind from shared title, but the concept is arguably applicable. There is also merit to the argument that who else but the State would protect the publicly held resources? See, e.g., Illinois ex rel. Raoul, 2023 WL 3292591, at *3 ("If the State cannot bring the action to protect its natural resources, those resources would remain unprotected."). These are developing areas of the law, and the Vermont Supreme Court has not addressed these questions. Grant of a motion to dismiss for failure to state a claim "is proper only when it is beyond doubt that there exist no facts or circumstances consistent with the complaint that would entitle the plaintiff to relief. .." Bock v. Gold, 2008 VT 81, ¶ 4, 184 Vt. 575 (quotation and citations omitted). Trial courts are instructed to "be especially reluctant to dismiss on the basis of pleadings when the asserted theory of liability is novel or extreme." Ass'n of Haystack Prop. Owners, Inc. v. Sprague, 145 Vt. 443, 447 (1985). For these reasons, the court does not believe that dismissal is appropriate.

## E. Groundwater Protection Act

The State brings a claim under the Groundwater Protection Act, 10 V.S.A. § 1410(c) (Count 7). Monsanto contends that this claim fails because the State has failed to allege an underlying tort claim. As discussed above, however, the State has adequately alleged several tort claims. Thus, the Groundwater Protection Act claim also survives the motion to dismiss.

## F. Retroactive Liability Under Waste Management Act (10 V.S.A. § 6615)

In Count 8, the State seeks to hold Monsanto liable under the Vermont Waste Management Act, 10 V.S.A. § 6615, for the costs of investigation, removal, and remedial actions, and to impose civil penalties (presumably pursuant to 10 V.S.A. §§ 8003(a)(12) and 8221(a)). Monsanto contends that retroactive liability under § 6615 violates due process.

The Waste Management Act provides: "any person who manufactured for commercial sale a hazardous material and who knew or should have known that the material presented a threat of harm to human health or the natural environment" "shall be liable for abating a release or threatened release of hazardous material and the costs of investigation, removal, and remedial actions incurred by the State that are necessary to protect the public health or the environment." 10 V.S.A. § 6615(a)(5). Subsection (a)(5) was added by the legislature in 2021 through Act 93, which also provided that "Notwithstanding any contrary provision of 1 V.S.A. § 214, the amendment contained in [] § 6615(a)(5) shall apply to any relevant release of a hazardous material regardless of the date of the relevant release, including releases that occurred prior to the effective date of [] § 6615(a)(5)." 2022 Vermont Laws No. 93, § 3 (S. 113).

21

Statutes are presumed to be reasonable and constitutional. Badgley v. Walton, 2010 VT 68, ¶ 20, 188 Vt. 367. A plaintiff has the burden to prove a statute's unconstitutionality. Boyd v. State, 2022 VT 12, ¶¶ 20, 23, 32; *see also* Pension Ben. Guar. Corp. v. R.A. Gray & Co., 467 U.S. 717, 729 (1984) ("It is by now well established that legislative Acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality, and that the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way.") (quotation omitted).

Retroactive application of statutes is not prohibited. However, "[l]aws are generally prospective and legislative acts must unequivocally express an intent to have retrospective application." A.B. v. S.U., 2023 VT 32, ¶ 21 (quotations and brackets omitted). Thus, "any retroactive application must be explicit." Id.; *see also* Carter v. Fred's Plumbing & Heating Inc., 174 Vt. 572, 575 (2002) (explaining that statute will not be construed to apply retroactively without clear language indicating Legislature's intent). Here, the statute at issue explicitly provides for retroactive application of the new provision regarding manufacturer liability.

In a due process challenge, retroactive legislation is subject to a higher burden than prospective legislation, "[b]ut that burden is met simply by showing that the retroactive application of the legislation is itself justified by a rational legislative purpose." Pension Ben. Guar. Corp. v. R.A. Gray & Co., 467 U.S. 717, 730 (1984). For instance, in Usery v. Turner Elkhorn Mining Co., 428 U.S. 1, 15–20 (1976), the Court rejected a constitutional challenge to the retroactive effects of a federal statute that required coal mine operators to compensate former employees disabled by pneumoconiosis, even though those employees had terminated their work in the industry before the statute was enacted. The

Court recognized that the statute had "retrospective effect" and that "the liability imposed . . . for disabilities suffered by former employees was not anticipated at the time of actual employment," but nevertheless concluded that "the imposition of liability for the effects of disabilities bred in the past is justified as a rational measure to spread the costs of the employees' disabilities to those who have profited from the fruits of their labor—the operators and the coal consumers." Id. at 16, 18.

As in Usery, the retroactive application of 10 V.S.A. § 6615(a)(5) is justified by an obvious rational legislative purpose: to spread the costs of hazardous materials pollution to manufacturers, who have profited from those materials. That was a legislative policy decision that this court cannot disturb. And the allegations of the complaint give no indication that such retroactivity is unfair as applied here. It is alleged that Monsanto produced over 99% of all PCBs and sold PCBs with knowledge of the danger they posed and with knowledge that the raw PCBs would be incorporated into various household products. It seems more than fair to assign liability to the manufacturer for abatement costs. Moreover, federal courts have "held uniformly" that the retroactive operation of CERCLA's similar liability provisions survives due process challenges. United States v. Monsanto Co., 858 F.2d 160, 174 & n.31 (4th Cir. 1988) (listing cases); *see also* ASARCO LLC v. Goodwin, 756 F.3d 191, 200 (2d Cir. 2014); United States v. Ne. Pharm. & Chem. Co., 810 F.2d 726, 734 (8th Cir. 1986). While Monsanto complains that § 6615(a)(5) does not require the State to prove causation and does not allow manufacturers to bring statutory contribution claims against other responsible parties under § 6615(i), both § 6615 and CERCLA from the start have not required the government to prove causation, and CERCLA did not originally have any statutory contribution right. *See* Folino v. Hampden Color & Chemical, 832 F.Supp. 757, 761 (D. Vt. 1993) ("No such causation

requirement is contained in CERCLA. The Vermont statute, 10 V.S.A. § 6615(a), parallels CERCLA in this regard.") (citations omitted); PL 99–499 (HR 2005), § 113, October 17, 1986 (adding contribution right).

Civil penalties present a tougher call. Monsanto argues that, at the very least, the retroactive application of this claim violates due process and the ex post facto clause—*see* Myers v. Baker, 2023 VT 7, ¶ 9—to the extent the State seeks *civil penalties* because such penalties are punitive in nature. It relies on Tull v. United States, 481 U.S. 412, 423 (1987), which held that a particular civil penalties provision of the federal Clean Water Act—33 U.S.C. § 1319(d)—was punitive in nature for the purposes of deciding whether the Seventh Amendment required a jury trial in such cases. The State notes that our Supreme Court has rejected the reasoning of Tull in deciding whether civil penalties under the same statute at issue here constituted punishment and thus triggered the Vermont Constitution's right to a civil jury trial. State v. Irving Oil Corp., 2008 VT 42, ¶ 17, 183 Vt. 386 ("we do not find *Tull* persuasive"). Instead, the Court explained that "in a[n] . . . environmental-enforcement setting[,] [t]he primary purpose of civil penalties is *not* punishment. Rather, these penalties serve a remedial purpose by making noncompliance at least as costly as compliance. They also reimburse the government for enforcement expenses and other costs generated by the violation." Id. (quotations omitted) (first two brackets added); *see also* id. ¶ 19 (noting that this conclusion "finds additional support in decisions from other states reaching the same conclusion in similar environmental-enforcement contexts") (listing cases). But Monsanto argues that Tull still applies here because it is "federal constitutional law" that determines whether a property interest "rises to the level of a legitimate claim of entitlement protected by the Due Process

Clause." <u>Town of Castle Rock, Colorado v. Gonzales</u>, 545 U.S. 748, 756–57 (2005) (emphasis and quotation omitted).

Even if <u>Tull</u> applies, it did not conclude that all civil penalties are inherently punitive. Rather, it held merely that a particular statutory provision was punitive in the context of deciding whether the Seventh Amendment's jury trial right applies. <u>Tull</u>, 481 U.S. at 423. The civil penalty statute applicable here requires consideration of eight factors, one of which was "the deterrent effect of the penalty." 10 V.S.A. § 8010(b)(6); *see also* 10 V.S.A. § 8221(b)(6) ("In fixing the amount of the penalty, the court shall apply the criteria set forth in subsections 8010(b) and (c) of this title."). While that factor suggests that the penalty has some punitive effect, it is not dispositive on its own. Deterrence is "a traditional goal of criminal punishment, [b]ut the mere presence of this purpose is insufficient to render a sanction criminal, as deterrence may serve civil as well as criminal goals." <u>Hudson v. United States</u>, 522 U.S. 93, 105 (1997). Notably, another factor is "the State's actual costs of enforcement," 10 V.S.A. § 8010(b)(7), a plainly compensatory purpose. *See* <u>State ex rel. Foy v. Austin Cap. Mgmt., Ltd.</u>, 355 P.3d 1, 14–15 (N.M. 2015) (discussing cases that have found civil penalties in remedial securities enforcement statutes to be compensatory). Thus, it makes little sense to "resolve the issue of whether the civil penalties awarded . . . are punitive and violate ex post facto principles until there is a definitive amount awarded." <u>Id</u>. at 15.

## Order

The motion to dismiss is denied. Monsanto shall file its answer within 14 days, and the parties shall file a discovery schedule within thirty days thereafter.

Electronically signed on May 29, 2024 pursuant to V.R.E.F. 9(d).

Helen M. Toor
Superior Court Judge

25